CHARLES CARREON (CSB # 127139)
3241 E. Blacklidge Drive
Tucson, Arizona 85716
Tel:  628-227-4059
Email: chascarreon@gmail.com

Attorney for Plaintiffs Arizona Yagé Assembly
and the North American Association of Visionary Churches

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIZONA YAGÉ ASSEMBLY, and NORTH AMERICAN ASSOCIATION OF VISIONARY CHURCHES, | Case No.: |
| Plaintiffs, | **COMPLAINT** |
| vs. | 1. RELIGIOUS FREEDOM RESTORATION ACT [42 U.S.C. § 2000bb-1(c)] |
| WILLIAM BARR, Attorney General of the United States; UTTAM DHILLON, Acting Administrator of the U.S. Drug Enforcement Administration; CHAD F. WOLF, Acting Secretary of the Dept. of Homeland Security; MARK A. MORGAN, Acting Commissioner of U.S. Customs and Border Protection; THOMAS PREVOZNIK, Deputy Assistant Administrator of the DEA Dept. of Diversion Control, in his personal capacity; and, the UNITED STATES OF AMERICA, | 2. REVIEW OF AGENCY ACTION [5 U.S.C § 702] 3. DECLARATORY RELIEF [28 U.S.C. § 2201 – 2202] JURY DEMAND |
| Defendants. | |

# Table of Contents

Table of Contents.................................................................................................ii

I. JURISDICTION ............................................................................................. 1

II. INTRADISTRICT ASSIGNMENT .............................................................. 1

III. NATURE OF THE CASE .............................................................................. 1

IV. THE LAW OF THE LAND ........................................................................... 3

    A. The First Amendment of the United States Constitution ...................................... 3

    B. Prior Restraints on Free Exercise Violate the First Amendment....................... 5

    C. First Amendment Protections for Religion Before and After RFRA ................. 5

    D. Corporate Standing to Assert RFRA Claims...................................................... 8

    E. RFRA Plaintiffs May Sue for Exemption from Laws or Administrative
        Regulations That Threaten Financial Penalties, Property Seizure, or Arrest
        As a Consqeuence of Free Exercise ...................................................... 9

    F. O Centro Beneficente – Application of RFRA to the CSA ............................. 10

V. SUBSTANTIVE ALLEGATIONS .............................................................. 11

    A. Ayahuasca, The Sacramental Substance ......................................................... 11

        a. Ayahuasca's Sacramental Character Is Intrinsic to Its Origins.............. 11

        b. Ayahuasca Use Provides a Warrant of Religious Sincerity That Justifies
            Minimal Regulatory Intrusion as the "Least Restrictive Means"  ... 13

    B. Arizona Yage Assembly ................................................................................... 14

    C. The North American Association of Visionary Churches................................. 17

    D. The Drug Enforcement Administration............................................................ 20

    E. Plaintiffs Need DEA Regulatory Services to Engage in Free Exercise .......... 21

    F. The DEA's Policy of Denying Regulatory Services to Visionary Churches.... 21

    G. DEA Regulatory Regimes Imposed by Statute or Injunction ......................... 23

        a. The Peyote Regulatory Regime Was Allowed by Statute..................... 24

        b. The UDV Regulatory Regime Was Required by Injunction ................. 24

        c. The Daime Regulatory Regime Was Required by Injunction .............. 25

    d.  The UDV and Santo Daime Regulatory Regimes Provide No
        Jurisdictional Basis for Regulating Plaintiffs ............................................. 25

H.  The DEA's "Guidance" Is A Pretext to Deny Plaintiffs Regulatory Services . 25

I.  The Guidance Imposes An Unconstitutional Prior Restraint on Free Exercise  27

J.  The Guidance Adjudication Process Substantially Burdens Free Exercise ...... 27

K.  The Guidance Lays a Large, Useless Financial Burden Upon Free Exercise .. 28

L.  The Guidance Substantially Burdens Free Exercise When Used As a Pretext
    for Issuing *de facto* Stop Orders and Administrative Subpoenas  .............. 29

M.  The Guidance Substantially Burdens Free Exercise by Extracting Inculpatory
Statements from Visionary Church Leaders ........................................... 31

N.   The Guidance Remains Extant Because the DEA Ignored the AG's
*Memorandum on Federal Law Protections for Religious Liberty* ........................ 32

O.  The Guidance Wasn't Reviewed by the DEA As Required by
Executive Order 13891 ........................................................................ 33

P.  The President Rescinded the Guidance ........................................... 35

VI.  FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS UNDER
RELIGIOUS FREEDOM RESTORATION ACT, 42 U.S.C. § 2000bb-1(c) ................. 35

VII. SECOND CLAIM FOR RELIEF FOR REVIEW OF AGENCY ACTION  UNDER
5 U.S.C. § 702 ........................................................................................... 39

VIII.THIRD CLAIM FOR DECLARATORY RELIEF UNDER 28 U.S.C. § 2201 -
22010  ...................................................................................................... 44

IX. PRAYER FOR RELIEF ............................................................................. 48

 JURY DEMAND............................................................................................ 54

For their complaint against defendants, plaintiffs Arizona Yagé Assembly and the North American Association of Visionary Churches ("Plaintiffs") allege:

## I.  JURISDICTION

**1.**   This Court has jurisdiction over this action pursuant to 28 USC §§ 1331, because it is an action arising under the Constitution and federal statutes.

**2.**   This Court has authority pursuant to 28 U.S.C. §§ 2201-2202, to grant declaratory relief and to issue preliminary and permanent injunctions. The Court further has authority under 5 U.S.C. § 702 to compel agency action unlawfully withheld or unreasonably delayed, and to set aside an agency's acts or failures to act that are: contrary to constitutional right, privilege or immunity; in excess of statutory jurisdiction, authority or limitations; or, carried on without the procedure required by law.

**3.**   Venue is proper under 28 USC § 1391(e)(1)(c) against the personally-named defendants, all officers of agencies of the United States acting in their official capacities, because Plaintiffs are California corporations domiciled in California, their state of incorporation, and no real property is involved in the action.

## II.  INTRADISTRICT ASSIGNMENT

**4.**   This action is filed in the U.S. District Court courthouse located at 450 Golden Gate Avenue, San Francisco, California, pursuant to L.R. 3-2(c).

## III.  NATURE OF THE CASE

**5.**   This action is brought under 42 U.S.C. § 2000bb-1(c), the Religious Freedom Restoration Act ("RFRA"), 28 U.S.C. § 2201-2202, and 5 U.S.C. § 702.

**6.**   Plaintiffs are two religious nonprofit corporations whose religious exercise, and that of their member churches and congregants, is substantially burdened by laws prohibiting importation, distribution, and possession of Ayahuasca, an herbal tea that contains a small amount of Dimethyltryptamine ("DMT"), a Schedule I controlled substance under the Controlled Substances Act 21 U.S.C. § 801 et. seq. (the "CSA").

**7.**   William Barr, Attorney General of the United States, is named in his capacity as Chief Law Enforcement Officer of the United States, head of the Department of Justice,

and the ultimate head of the Drug Enforcement Agency ("DEA").[1]  Uttam Dhillon is named in his official capacity as Acting Administrator of the DEA.  Chad F. Wolf is named in his official capacity as the Acting Secretary of the Department of Homeland Security ("DHS").  Mark A. Morgan is named in his official capacity as Acting Commissioner of Customs and Border Protection ("CBP")  Each of these agencies (separately and collectively, "the Government"), enforces the CSA's proscriptions in various aspects of their operations, exerting legal authority over all movements of controlled substances, that thus affect the Free Exercise of plaintiffs.

**8.**  The United States of America is made a defendant for purpose of seeking review of DEA agency action pursuant to 5 U.S.C. § 702.[2]

**9.**  Thomas Prevoznik, the Acting Deputy Assistant Administrator of the Office of Diversion Control, is named in his personal capacity for actions committed under color of law, pursuant to RFRA.[3]

**10.**  As RFRA claimants seeking religious exemptions from the proscriptions of general law, plaintiffs allege a *prima facie* case of sincere religious belief.  Plaintiffs further allege that specified statutes and regulations found in the CSA and 21 CFR 1300 *et seq.,* and the DEA's *Guidance Regarding Petitions for Religious Exemption from the*

---

[1] The DEA originated from President Nixon's Executive Order 11727, and has no enabling legislation. *United States v. Lippner*, 676 F. 2d 456, 461 (11th Cir., 1982), *citing* 28 U.S.C. § 510; 28 C.F.R. § 0.100.  Authority over the DEA is split.  "The Attorney General does not have the sole delegated authority under the CSA. He must instead share it with, and in some respects defer to, the Secretary [of Health and Human Services], whose functions are likewise delineated and confined by the statute."  *Gonzales v. Oregon*, 546 U.S. 243, 265, 126 S. Ct. 904, 920, 163 L.Ed.2d 748, 772 (2006).

[2] Section 702 provides in relevant part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  *** The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance."

[3] "[W]e hold that RFRA, like Section 1983, authorizes a plaintiff to bring individual capacity claims against federal officials or other "person[s] acting under color of [federal] law."  *Tanvir v. Tanzin*, 889 F.3d 72 (2d Cir. 2018), cert. granted, 140 S. Ct. 550, 205 L.Ed.2d 353 (2019).

*Controlled Substances Act Pursuant to the Religious Freedom Restoration Act[4]* (the "Guidance") substantially burden their religious exercise. Plaintiffs further allege that the provisions of the CSA, 21 CFR 1300 *et seq.* and the Guidance are not reasonably tailored to fit the needs of visionary churches and impose a substantial burden on their rights of Free Exercise by way of visionary communion.

## IV.  THE LAW OF THE LAND

### A.  The First Amendment of the United States Constitution

**11.**   The United States is strongly committed to protecting the rights of Free Exercise, Free Expression of religious thought, and, under the Establishment Clause, freedom from state entanglement with religion. The nation's deep commitment is enshrined in the First Amendment, that provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**12.**   Although religious groups seeking freedom from religious oppression in England and Europe founded many of the first American colonies, most did not extend freedom of religious belief to churches outside their particular sects. The insular character of organized religion changed in the wake of the Great Awakening of 1742, a worldwide religious up-swelling that kindled countless independent religious ministries in the American colonies. Diversity of religion gave fertile soil to an attitude of tolerance that, aided by the effort of principled advocates within the religious and legal communities, ripened into the commitment to universal religious freedom that the nation now embraces.

**13.**   Among the Framers, James Madison is remembered as the foremost champion of the First Amendment; accordingly, his views on freedom of religion carry particular weight in our jurisprudence. Although he published them without disclosing his authorship,

---

[4] *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act,* https://www.deadiversion.usdoj.gov/pubs/rfra_exempt_022618.pdf.January 2009.

Madison's views first came to light in 1785 in *A Memorial and Remonstrance Against Religious Assessment*, opposing a proposed Virginia state tax to fund churches. Madison argued that the law violated the freedom to exercise one's conscience to decide matters of religion, which he deemed an "unalienable right." Madison gave two reasons for this pronouncement. *First*, each person is disposed to establish their own relationship with the Creator, "based on the evidence," and cannot follow "the dictates of other men" regarding that relationship. *Second*, it is an unalienable right because prior to the claims of society, we are all subject to "the duty … to render to the Creator such homage … as he believes is acceptable to him." [5]

**14.** Having strenuously argued for the right to worship one's Creator in a way that suits one's disposition, Madison argued equally forcefully for the right to disbelieve:

> Whilst we assert for ourselves a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us.

**15.** Madison thus grounded the right to disbelieve in our "*equal* title to the free exercise of religion according to the dictates of Conscience." [6] Supremacy of conscience has become the law of the land:

> "Putting aside dogmas with their particular conceptions of deity, freedom of conscience itself implies respect for an innate conviction of paramount duty. The battle for religious liberty has been fought and won … upon the very ground of the supremacy of conscience within its proper field." [7]

---

[5] "The Religion … of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him. This duty is precedent, both in order of time and in degree of obligation, to the claims of Civil Society." https://founders.archives.gov/documents/Madison/01-08-02-0163

[6] Madison here quoted Article XVI of the Virginia Declaration of Rights, adding emphasis to the word "equal."

[7] *United States v. Seeger*, 380 U.S. 163, 176, 85 S. Ct. 850, 859, 13 L.Ed.2d 733, 742-43 (1965), *quoting United States v. Macintosh*, 283 U.S. 605, 634, 51 S. Ct. 570, 578, 75 L.Ed. 1302, 1315 (1931).

**16.**  The First Amendment protects a personal code of conscience that serves the same purposes as religion serves in the life of the religious.

> "The central consideration in determining whether the registrant's beliefs are religious is whether these beliefs play the role of a religion and function as a religion in the registrant's life."[8]

## B.  Prior Restraints on Free Exercise Violate the First Amendment

**17.**  Free Exercise enjoys overlapping protections under the First Amendment, as Free Exercise and as expressive activity, protected regardless of its content.  Sharing religious beliefs, group and solitary prayer, sacred songs and communion ceremonies are all expressive acts of Free Exercise.  Religious expression, like secular expression, is accorded the highest level of Constitutional protection.

**18.**  "Religious freedom, *i.e.*, free exercise, must not be subject to prior restraint."[9] Administrative or judicial schemes that require religious practitioners to obtain a license issued by a Government authority that determines "what is a religious cause" do not pass Constitutional muster, because they lay "forbidden burdens" on religious practitioners. In *Cantwell v. Connecticut*, the Court held:

> [T]o condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution.[10]

## C.  First Amendment Protections for Religion Before and After RFRA

**19.**  Congress enacted RFRA to protect what Madison declared an unalienable right, precedent to the claims of Civil Society – Free Exercise.  "Congress enacted RFRA in

---

[8] *Welsh v. United States*, 398 U.S. 333, 339, 90 S. Ct. 1792, 26 L. Ed. 2d 308 (U.S. June 15, 1970).

[9] *Follet v. Town of McCormick,* 321 U.S. 573, 576, 64 S.Ct. 717, 88 L.Ed. 938 (1944).

[10] *Cantwell v. Connecticut*, 310 U.S. 296, 307, 60 S. Ct. 900, 904-05, 84 L.Ed. 1213, 1219 (1940) (statute imposed "forbidden burdens" on Free Expression and Free Exercise by prohibiting religious door-to-door solicitation without a permit from a "public welfare council" authorized to "determine whether such cause is a religious one").

1993 in order to provide very broad protection for religious liberty."[11]  RFRA protects religious liberty by requiring the Government to justify substantially burdening Free Exercise by establishing that the prohibition or compulsion at issue is the least restrictive means of advancing a compelling Government interest.

**20.**  RFRA was enacted to legislatively overrule *Employment Division v. Smith*, that denied a Native American Church practitioner's claim of religious exemption from Oregon regulations that denied him unemployment compensation benefits as a penalty for consuming sacramental peyote at a Native American Church meeting.  *Smith* held that the law criminalizing peyote possession was facially neutral, not directed at curtailing Native American religious rights, and therefore, the Government's "ability to enforce generally applicable prohibitions … 'cannot depend on measuring the effects of a Governmental action on a religious objector's spiritual development.'" [12]

*21.  Smith* marked a sharp turn away from traditional Free Exercise jurisprudence, as Justice Blackmun's dissent pointedly noted:

> This Court over the years painstakingly has developed a consistent and exacting standard to test the constitutionality of a state statute that burdens the free exercise of religion. Such a statute may stand only if the law in general, and the State's refusal to allow a religious exemption in particular, are justified by a compelling interest that cannot be served by less restrictive means.  Until today, I thought this was a settled and inviolate principle of this Court's First Amendment jurisprudence.[13]

**22.**  In 1993, "Congress responded to *Smith* by enacting RFRA" to protect Free Exercise from facially neutral laws that "may burden religious exercise as surely as laws intended to interfere with religious exercise."[14]

**23.**  RFRA grants Free Exercise claimants a private right of action in federal court to obtain exemptions from civil or criminal laws and regulations that substantially burden

---

[11] *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693, 134 S. Ct. 2751, 2760, 189 L.Ed.2d 675, 687 (2014).

[12] *Employment Div. v. Smith,* 494 U.S. 872, 885, 110 S. Ct. 1595 (1990), *quoting Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 441, 108 S. Ct. 1319, 1321 (1988).

[13] *Smith*, 494 U.S. 872, 907-908, 110 S. Ct. 1595, 1615-1616, 108 L. Ed. 2d 876, 904-905 (1990).

[14] *Burwell*, 573 U.S. 682, 694 (U.S. June 30, 2014).

their Free Exercise. [15]  RFRA mandates the strict scrutiny standard of review for determination of the Constitutional issues raised in such cases, reinstating the standard that Justice Blackmun articulated in his *Smith* dissent.

**24.**  RFRA claimants may challenge a federal law or regulation[16] that forbids conduct that a religious person's Free Exercise requires.  RFRA plaintiffs must show that their sincere religious practice is substantially burdened by the Governmental law, regulation or policy.  Free Exercise is substantially burdened "when individuals are … coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions."[17]

**25.**  Once a RFRA plaintiff establishes that its Free Exercise rights are substantially burdened by a federal law or regulation, the burden of persuasion shifts to the Government to demonstrate that application of a substantial burden to the person is the least restrictive means of furthering a compelling Government interest.  The least restrictive means standard is "exceptionally demanding," and requires the Government to show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases."[18]

**26.**  In *Burwell v. Hobby Lobby*, the Court summarized the RFRA standard:

> RFRA prohibits the "Government [from] substantially burden[ing] *a person's* exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to *the person*—(1) is in furtherance of a compelling Governmental interest; and (2) is the least restrictive means of furthering that compelling Governmental interest."

---

[15] "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a Government."  42 U.S.C. §2000bb-1(c).

[16] Congress enacted RFRA to apply to states and municipalities as well, but the Court found the application to non-federal Governmental units unconstitutional. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695 (2014), *quoting City of Boerne v. Flores*, 521 U.S. 507, 533-553, 117 S. Ct. 2157, 138 L. Ed. 2d 6244  (1997).

[17] *Navajo Nation v. United States Forest Service*, 535 F.3d 1058 (9th Cir. 2008) (en banc), *cert. denied*, 129 S.Ct. 2763 (2009).

[18] *Burwell,* 573 U.S. 682, 728, 134 S. Ct. 2751, 2780, 189 L.Ed.2d 675, 709 (2014).

**27.**  In 1994, Congress expanded RFRA's definition of Free Exercise by passing the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"),[19] and incorporating RLUIPA's definition of the "exercise of religion" into RFRA, making the two statutory schemes congruent.[20]  Justice Alito's opinion in *Burwell* explains the significance of the change:

> Before RLUIPA, RFRA's definition made reference to the First Amendment. In RLUIPA, in an obvious  effort to effect a complete separation from First Amendment case law, Congress deleted the reference to the First Amendment and defined the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." And Congress mandated that this concept "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."[21]

### D.  <u>Corporate Standing to Assert RFRA Claims</u>

**28.**  RFRA provides a private right of action to "a person whose religious exercise has been burdened," which includes churches, their congregations, and church associations. RFRA standing is flexible and expansive, and is not limited by pre-RFRA Free Exercise precedents.[22]  Corporations, both non-profit corporations like NAAVC and AYA, and for-profit closely-held corporations like Hobby Lobby, that employed over 13,000 people when the *Burwell* case was decided, are equally entitled to assert RFRA claims when burdened by Government regulation.  In *Burwell*, the Court held that the federal courts are well able to determine the "sincerity of corporate religious belief," and found "no evidence that the purported problem of determining the sincerity of an asserted

---

[19] *Burwell, supra.*, 573 U.S. 682, 695-696, *quoting* 42 U.S.C. §2000cc *et seq*.

[20] *Burwell, at id., quoting* §2000bb-2(4) (importing RLUIPA definition).

[21] *Burwell, at id., quoting*  §2000cc-5(7)(A) and *citing* §2000cc-3(g)(emphasis by the Court).

[22] It "would be absurd if RFRA merely restored this Court's pre-*Smith* decisions in ossified form and did not allow a plaintiff to raise a RFRA claim unless that plaintiff fell within a category of plaintiffs one of whom had brought a free-exercise claim that this Court entertained in the years before Smith." *Burwell*, 573 U.S. 682, 715-716, 134 S.Ct. 2751, 2760, 189 L.Ed.2d 675, 687 (2014).

religious belief moved Congress to exclude for-profit corporations from RFRA's protection."[23]

### E. RFRA Plaintiffs May Sue for Exemption from Laws or Administrative Regulations That Threaten Financial Penalties, Property Seizure, or Arrest As a Consequence of Free Exercise

**29.**  RFRA plaintiffs need not wait for the Government to take adverse action targeting them to allege actionable claims for injunctive relief under RFRA to protect their right of Free Exercise from prior restraints, enforcement activity, and prosecution.  RFRA allows plaintiffs to seek protection from laws and regulations that impose prior restraints upon, or chill Free Exercise and Free Religious Expression by threat of criminal or regulatory sanctions.  Where performing acts of Free Exercise will expose a religious person to civil or criminal penalties, RFRA plaintiffs may obtain a declaration that their conduct is subject to exemption as Free Exercise before being forced to bend their principles to comply with administrative prior restraints and prohibitory criminal statutes.  *Eg.*, in *Burwell*, plaintiffs Hobby Lobby, Conestoga, and Mardel showed only that they had been put to a Hobson's choice between Free Exercise and compliance with the Department of Health and Human Service's regulations issued pursuant to the Affordable Care Act. They could pay for insurance for abortions and sin before God, or violate the regulation and pay a financial penalty.  Alternatively, they could cancel everyone's insurance altogether, and violate the religious principle of being charitable to employees.  This, the Court held, gave the plaintiffs standing under RFRA to sue for a judicial exemption from the effects of the HHS regulations.

> Protecting corporations from government seizure of their property without just compensation protects all those who have a stake in the corporations' financial well-being. And protecting the free-exercise rights of corporations like Hobby Lobby, Conestoga, and Mardel protects the religious liberty of the humans who own and control those companies.[24]

---

[23] *Burwell*, 573 U.S. 682, 718.
[24] *Burwell*, 573 U.S. 682, 707.

**30.**  Likewise, AYA, NAAVC, and NAAVC's member churches and congregations all stand at risk of having their sacramental Ayahuasca seized, and their Free Exercise punished by arrest, trial, conviction and a term of years in the custody of the Bureau of Prisons. Plaintiffs can only obtain sacramental Ayahuasca from South America by international shipping that is subject to interdiction and seizure.  Plaintiffs have had Ayahusaca seized by DHS, as further alleged below.

**31.**  NAAVC members and their congregations have suffered seizure of sacramental Ayahuasca destined for sharing with congregations in Free Exercise of their right to practice visionary communion in sacred ceremony.

**32.**  The dangers of seizures of the sacrament, invasion of religious services, and arrest of church leaders and congregants are clear and present dangers to the visionary church community.

**33.**  Enforcement overreach by the DEA against churches entitled to exemption has occurred before, as alleged hereinbelow, and there is no regulation or law that the DEA recognizes that prevents a recurrence.

### F.  <u>O Centro Beneficente – Application of RFRA to the CSA</u>

**34.**  Under the principles enunciated by the United States Supreme Court in *Gonzalez v. O Centro Beneficente Uniao do Vegetal*,[25] it is the law of the land that a sincere religious practitioner may consume Ayahuasca tea for sacramental purposes, that the DEA must exempt that conduct from criminal and administrative sanction, and that the right is enforceable in a RFRA action.

**35.**  In *O Centro*, a crucial element of the Supreme Court's decisional process was its conclusion that an absolute prohibition on sacramental Ayahuasca was not the least restrictive means of furthering the Government's compelling interests.  In reaching this conclusion, the Court *first* observed that strict scrutiny applies case-by-case analysis to "the particular claimant whose sincere exercise of religion is being substantially

---

[25] *Gonzalez v. O Centro Beneficente Uniao do Vegetal,* 546 U.S. 418, 126 S. Ct. 1211, 163 L.Ed.2d 1017 (2006).

burdened."[26]  *Second*, the Court applied strict scrutiny and found that, although Schedule I substances are exceptionally dangerous, "there is no indication that Congress, in classifying DMT, considered the harms posed by the particular use at issue here -- the circumscribed, sacramental use of hoasca by the UDV."[27]

**36.**   Thus, under *O Centro*, RFRA claimants seeking exemption from the CSA on Free Exercise grounds are given an opportunity to demonstrate that, as applied to them, the CSA is not the least restrictive means for the Government to further its compelling interests.  If they are able to make that showing, then less restrictive options must be made available to the plaintiff, which in the case of the UDV, meant licensing the church to import, manufacture and distribute its sacrament exclusively to its church members, pursuant to a religious exemption from the prohibitions of the CSA and related regulations.[28]

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Ayahuasca. The Sacramental Substance

#### a.   Ayahuasca's Sacramental Character is Intrinsic to Its Origins

**37.**   Ayahuasca, referred to as "Hoasca" in *O Centro*, is an herbal tea made of two herbs drunk as a ceremonial sacrament in religious ceremonies that arose among Amazonian tribes in Brazil, Peru, Ecuador, and other Latin American countries.  Ayahuasca is an herbal preparation that is not listed as a drug of abuse in the latest DEA Resource Guide, *Drugs of Abuse*.[29]

---

[26] *O Centro*, 546 U.S. 418, 431-432, 126 S. Ct. 1211, 1226, 163 L.Ed.2d 1017, 1032 (2006).
[27] *O Centro*, 546 U.S. 418, 432, 126 S. Ct. 1211, 1221, 163 L.Ed.2d 1017, 1032.
[28] Affirming "a preliminary injunction prohibiting the Government from enforcing the Controlled Substances Act with respect to the UDV's importation and use of *hoasca*. The injunction requires the church to import the tea pursuant to federal permits, to restrict control over the tea to persons of church authority, and to warn particularly susceptible UDV members of the dangers of *hoasca*."  *O Centro*, 546 U.S. 418, 427, 126 S. Ct. 1211, 1218, 163 L.Ed.2d 1017, 1029 (italics in original).
[29] *Drugs of Abuse,* A DEA Resource Guide / 2020 Edition. https://www.dea.gov/sites/default/files/2020-04/Drugs%20of%20Abuse%202020-Web%20Version-508%20compliant.pdf

**38.**  As a compound purposely created by Amazonian natives for spiritual purposes, Ayahuasca is a tea made of two herbs that have a joint effect on the human metabolism that neither herb alone will produce.  DMT, the controlled substance that subjects Ayahuasca to the prohibitory sanctions of the CSA, ordinarily produces no effect when consumed by mouth.  DMT as a drug of abuse is smoked to create a sudden, overpowering hallucinogenic experience that fades in minutes.  The Ayahuasca recipe, however, makes DMT orally active by brewing leaves from DMT-containing plants jointly with slices of *Banisteropsis Caapi*, the "yagé" vine.  Yagé is rich in beta-carbolenes, chemicals that sensitize the human metabolism so that a small amount of DMT, taken in a sacramental environment with persons of positive intent, becomes activated, and along with the yagé vine, that has its own divine character, generates a spiritually uplifting experience of approximately four hours.

**39.**  Those who prepare the sacramental Ayahuasca used by AYA have not industrialized the process in an effort to maximize production.  Such an attitude would be antithetical to the very reason for brewing Ayahuasca, which is to bring healing and wisdom to those who imbibe the sacred tea.  Ayahuasca is traditionally prepared in an atmosphere of sacramental respect for the spirits that animate the plants and transmit blessings to those who drink the tea. [30]

**40.**  The similarities between Ayahuasca and peyote are significant, and indicate that a like manner of relaxed regulation would be indicated under RFRA's least-restrictive means test.  Like peyote, Ayahuasca has a long history of sacramental use by native peoples, and like those who eat peyote, virtually all persons who drink Ayhuasca drink it at a religious ceremony.  Like peyote, Ayahuasca has an unpleasant taste and emetic

---

[30] Describing the practices of a Brazilian church that sued the Government under RFRA in the District of Oregon, the late Judge Owen Panner wrote: "The Santo Daime church brews Daime tea in Brazil during an elaborate religious ritual. Men gather the woody B. caapi vine and pound it for hours with mallets, while women collect and clean the P. viridis leaves. The shredded vine is boiled for many hours, constantly tended. P. viridis leaves are not added until boiling is nearly complete because the DMT dissolves rapidly."  *Church of the Holy Light of the Queen v. Mukasey*, 615 F.Supp.2d 1210, 1215 (2006) (vacated on other grounds).

qualities that render ingestion physically uncomfortable, and discourages recreational users. Like peyote, Ayahuasca's emetic effects are concurrent with purging forces that impede the sacramental communion experience. Like peyote, Ayahuasca induces introspective states of awareness that facilitate reflection and contemplation, rather than inducing the stimulation and euphoria sought by social and recreational drug users. Thus, like peyote, Ayahuasca is not a drug of abuse, and the courts have recognized that it tends not to be diverted into the illicit market. "As courts have repeatedly emphasized, cannabis differs critically from peyote and hoasca precisely because there is a thriving market for diverted cannabis, whereas there is no comparable demand for recreational peyote and hoasca."[31]

### b. Ayahuasca Use Provides a Warrant of Religious Sincerity That Justifies Minimal Regulatory Intrusion as the "Least Restrictive Means"

**41.** Under RFRA, the exemption process itself must be tailored to avoid substantially burdening the right of Free Exercise. As the courts have recognized, Ayahuasca is almost exclusively consumed in religious ceremonies; accordingly, visionary churches whose sacrament is Ayahuasca are using a sacrament that in itself affirms their claim of religious sincerity. The very activity of drinking Ayahuasca confirms their religious intent, because it is a demanding visionary experience that delivers rewards commensurate with sincerity. Further, visionary churches emphasize the importance of preparation as part of sincere intention in approaching the use of the sacrament, since an initially casual mindset often leads to hard lessons that appear necessary to ripen the practitioner's sincerity. Thus, the very use of Ayahuasca in a sacramental setting provides a warrant of sincerity; accordingly, the sincerity of the faith of visionary churches should be taken at face value, and in the absence of evidence that their faith is

---

[31] *United States v. Christie*, 825 F.3d 1048, 1060-1061 (2016), *citing O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1020 (10th Cir. 2004) (en banc)(McConnell, J., concurring).

feigned, they should be able to obtain an exemption from general law for the limited purpose of dispensing Ayahuasca as the communion sacrament in visionary churches, without being subject to a searching inquiry by any administrative agency or judicial officer.

**B. <u>Arizona Yagé Assembly</u>**

**42.**  Ayahuasca, *i.e.*, yagé, is the religious sacrament of the Arizona Yagé Assembly ("AYA"), a visionary church incorporated as a nonprofit corporation in the State of California.  After working with Ayahuasca for six years, the founder (the "Founder") established AYA as a visionary church in 2015, using Ayahuasca as AYA's communion sacrament.  As the Founder expressed it -- "Ayahuasca is the holy Sacrament of AYA, of which congregants must partake to receive the blessing of Communion."  AYA's doctrine teaches that sharing Ayahuasca sacramentally in ceremony is sharing a sacred substance that is not merely physical, and has the capacity to heal the entire human being, body, spirit, and mind, so that congregants can extend this healing to others and our entire world environment.   The experience of communion through Ayahuasca is the receipt of Divine Love and wisdom by the congregation.  The Founder has explained that in AYA, the doctrine "comes from the vine and the leaf."

**43.**  The Founder has imbued AYA with the religious intention to benefit all living beings through sharing Ayahuasca in sacred ceremony with those called to communion.  AYA's spiritual practice is a healing practice, and its healing practice is a spiritual practice.

**44.**  In AYA, healing takes place in sacred communion by means of drinking sacramental Ayahuasca.  Healing power is received in visions, in the direct experience of Divine Love, and through songs called "icaros" that are learned in and through the experience of communion, and by means of sacramentally drinking Ayahuasca.  Some icaros are drawn from South American traditions, and equally often they are received directly by congregants during Ayahuasca communion.  Icaros bring healing in many forms,

purifying, cleansing, restoring, calming, nurturing, energizing, and in many other ways vivifying the practitioner.

**45.**  AYA shares communion with congregants who express an avowedly sincere religious intention to receive the sacrament, and have been screened for physical or psychological vulnerabilities.

**46.**  The demographics and religious attitudes of AYA's congregation are indicative of the sincerity of its membership.  Seventy-one percent are over 30, and forty-six percent are over the age of 40.[32]   Ninety-six percent pray or meditate, and the same percentage state that their only use of Ayahuasca has been as a religious or spiritual practice. Ninety-eight percent consider participation in AYA ceremonies as beneficial to their spiritual growth.  Sixty-four percent connect with other church members between ceremonies.  Ninety-four percent see themselves returning to future ceremonies.

**47.**  AYA ceremonies are conducted by trained facilitators who apply AYA's Ceremonial Instructions, following best practices for the safe and efficacious administration of sacramental Ayahuasca.  Ninety-eight percent of AYA congregants reported that ceremony facilitators capably perform their ceremonial duties, and the same percentage said they felt physically and emotionally safe throughout the ceremony.

**48.**  AYA congregants prepare for the experience with set dietary restrictions the week before the ceremony.  Ceremonies begin in the evening.  When possible, ceremonies are conducted in a circular "maloka," traditionally made of natural wood with a palm roof. Congregants are provided comfortable places to sit and recline, and commit to remain for the entire ceremony.

**49.**  After the congregants have gathered quietly and focused their attention, the lead facilitator performs an invocation, rings a ceremonial bell, and offers each congregant a cup of Ayahuasca.  The lead facilitator may administer more drinks of tea at intervals,

---

[32] This statistic and all other percentages are drawn from a statistically significant sampling of responses to a questionnaire sent to all AYA congregants by AYA in 2018.

and uses discretion to provide each congregant with only so much of the sacrament as is necessary for them to receive a meaningful experience of communion.

**50.**  During ceremonies, many congregants experience deep religious sentiments directly connected with their own life experience, reviewing incidents from their past, recognizing their errors and those of others, purging their own guilt and forgiving others their wrongs, receiving mercy and forgiveness from the divine source, and experiencing the restful peace of Divine Love.  The ceremony concludes slowly, as the visionary experience subsides over the course of the night.  Facilitators attend to the condition of each congregant, and appropriate action is taken for their physical and psychological well-being.

**51.**  The experience of visionary communion is profound and uniquely personal.  For many AYA congregants, communion through Ayahuasca has proven pivotal to their spiritual growth and ethical development, helping them reconnect with their innate religious feeling, and learn how to express it in positive action.

**52.**  AYA's congregants' religious practice places them in potential peril of criminal prosecution by the federal Government.   Many AYA congregants censor their own speech about their religious beliefs and practices when speaking with some or all of their friends, family, employers, and coworkers.  Sixty-nine percent of AYA congregants are hesitant to tell others about their positive experiences because of questions surrounding the legality of this form of Free Exercise.  Fifty-three point nine percent are hesitant to tell family, close friends or associates about Ayahuasca for the same reason.

**53.**  Members of AYA's congregation may find themselves at a disadvantage when their credibility and law-abidingness is scrutinized, *i.e.*, when job-seeking, when testifying, as party to a lawsuit, when applying for a passport or visa, license, permit, or in countless other situations.  By prohibiting their central act of Free Exercise, the CSA's criminal prohibitions impose a severe and substantial burden upon AYA's Free Exercise of religion, and that of its congregants.  AYA's commercial relationships and ability to contract freely are impaired by the shadow of illegality that falls over the church.

**54.**  AYA's ability to share Ayahuasca with its congregants is substantially burdened by the prohibitions on importing, manufacturing, or dispensing a controlled substance in § 841(a) (2), by the prohibition on importation in § 952(a) of the CSA, and by 21 CFR 1312.11.

**55.**  AYA has associational standing to assert the claims of its members to receive sacramental Ayahuasca in AYA ceremonies, because their Free Exercise is substantially burdened by AYA's inability to obtain DEA regulatory services necessary to the practice of AYA communion.

**56.**  AYA seeks a decree establishing that its administration of sacramental Ayahuasca to its congregants is protected as Free Exercise; that AYA's Free Exercise is substantially burdened by the proscriptions of the CSA and the DEA's denial of regulatory services to visionary churches; and, that the DEA is required to issue a certificate of exemption to AYA, to grant it a DEA Number, and to provide it with all regulatory services necessary to allow the importation and dispensing of Ayahuasca to its congregation.

### C.  <u>The North American Association of Visionary Churches</u>

**57.**  North American Association of Visionary Churches ("NAAVC") is an interdenominational association of visionary churches,[33] formed as a religious nonprofit corporation in the State of California.  NAAVC was incorporated in 2019, and is operated by members of existing Ayahuasca visionary churches for purposes of engaging in the Free Exercise of visionary religion. NAAVC funds and promotes the study of visionary religion, sponsoring scholarship and media events that serve to increase understanding of and interest in visionary religious practice.

**58.**  The members of the Board of Directors are personally and institutionally devoted to helping visionary churches and practitioners to obtain a pure and efficacious Ayahusaca sacrament, free from the onus of illegality that substantially burdens visionary religious Free Exercise.  NAAVC's religious beliefs are embodied in its corporate statements of

---

[33] The term "visionary churches" encompasses all churches using sacramental plant-based herbal substances that contain substances scheduled under the CSA.

religious purpose and belief, affirming the sacramental nature of Ayahuasca.  AYA is a member of NAAVC, and the Founder of AYA is a member of the NAAVC board.  All NAAVC Board members are members of visionary churches.  All NAAVC Board members  have suffered injuries and damages alike in type and kind to those suffered by members of all of NAAVC's member churches and their congregations; thus, NAAVC Board members are personally aggrieved by the acts of the DEA and DOJ alleged herein, and their interests are closely tied to those of the churches and congregations on whose behalf NAAVC asserts associational standing.

**59.**   NAAVC's central act of Free Exercise is initiating and operating a lawful system for importing and sharing sacramentally-prepared Ayahuasca with visionary churches at reasonable cost, so that they may share the communion sacrament with their congregations.  NAAVC has adopted this definition of corporate Free Exercise by formal corporate resolution.  NAAVC has defined its Free Exercise as expanding the reach of visionary teachings through use of Ayahuasca as a communion sacrament by freeing visionary churches from the burdens and risks of obtaining imported Ayahuasca through systems that evade importation barriers and distribute the sacrament through underground networks.   NAAVC has devoted its corporate resources to the attainment of all legal permissions necessary to the fulfillment of this religious corporate mission to expand the Free Exercise rights of all visionary churches and their congregations.

**60.**   Sharing Ayahuasca in communion is an expressive Free Exercise of religion that transmits AYA's essential doctrine, and that of other visionary churches.  NAAVC seeks the exemptions necessary to transmit the doctrine to visionary churches by distributing Ayahuasca to visionary churches that obtain their own exemptions, and will need Ayahusaca for communion services.

**61.**   To fulfill its mission of Free Exercise by sharing the Ayahuasca sacrament with visionary churches, NAAVC requires regulatory services from the DEA; accordingly, it has joined in this action to complain of and seek relief from the substantial burdens on Free Exercise imposed by the CSA, and to obtain an order directing the DEA to provide

NAAVC with a DEA Number and regulatory services to allow it to engage in importation and dispensing of Ayahuasca to visionary churches.

**62.** The proposed importation and distribution of Ayahuasca as NAAVC's primary Free Exercise activity might be likened to the work of a kosher or halal food producer, that provides kosher or halal food that satisfies religious requirements.  Just as Free Exercise protects the right of religious persons to have food that satisfies their religious requirements, so also those who manufacture that food are protected by the right of Free Exercise.

**63.** Because the sharing of Ayahuasca in communion is a sharing of doctrine, NAAVC may also be likened to a supplier of host and communion wine for churches that celebrate mass, or sellers of devotional books and art, with which to inspire the spirits of the faithful.

**64.** NAAVC is ready, willing and able to import sacramentally prepared Ayahuasca from South American sources, and to distribute Ayahuasca to visionary churches as soon as it obtains:

> (a) Exemption from the prohibitions on manufacturing, distributing and dispensing to exempt visionary churches in Section 841(a)(2), and the prohibition on importation in Section 952(a); and,

> (b)  Issuance of a DEA Registration Number to use on DEA Form 357, the importation permit application form.

**65.** The Ayahuasca that NAAVC is ready to acquire and import is gathered in the Amazon jungle by traditional gatherers steeped in reverence towards sacramental plants, who brew the traditional herbs in a ceremonial fashion that safeguards its sacramental quality and visionary efficacy.  Once brewed, the importation and manufacturing of Ayahuasca for domestic dispensing must be handled in the same way, respectfully, with a loving and helpful intention, because these intentions pervade the Ayahuasca sacrament itself.

**66.**  NAAVC has associational standing to bring this action under RFRA and
5 U.S.C. § 702  for the benefit of its member churches to seek relief to which they are
entitled and would have standing to assert directly, to aid in their ability to obtain their
sacraments by obtaining an exemption from the CSA for the importation of Ayahuasca.
A determination in favor of NAAVC in this action will be beneficial to its member
visionary churches, who will be incentivized to secure individual RFRA exemptions,
knowing that a source of safe, lawful and efficacious sacrament will be available to serve
communion to their congregations.

**67.**  As alleged hereinbelow, all NAAVC member churches, like AYA, have suffered a
substantial burden on their Free Exercise of religion due to the DEA's conscious
indifference to their First Amendment rights, and denial of regulatory services that
greatly inhibits, and for some entirely denies, the right to engage in their practice of
visionary communion.

### D. <u>The Drug Enforcement Administration</u>

**68.**  The DEA describes its mission,[34] in relevant part, as follows:

> The mission of the Drug Enforcement Administration (DEA) is to enforce
> the controlled substances laws and regulations of the United States and
> bring to the criminal and civil justice system of the United States, or any
> other competent jurisdiction, those organizations and principal members of
> organizations, involved in the growing, manufacture, or distribution of
> controlled substances appearing in or destined for illicit traffic in the United
> States….

**69.**  The DEA operates 222 Domestic Offices, organized into 22 Domestic Field
Divisions.  DEA also operates 91 foreign offices in 70 countries.  In its Fiscal Year 2019
Budget Request, the DEA requested $2,862,200,000.  The DEA described its FY 2019
Strategy,[35] in relevant part, as follows:

> DEA continues to prioritize its resources to disrupt and dismantle the "most
> wanted" drug trafficking and money laundering organizations believed to
> be primarily responsible for the nation's illicit drug supply. This includes
> the Consolidated Priority Organization Targets (CPOTs) identified by DOJ,
> plus other Priority Target Organizations (PTOs) identified by DEA.

---

[34] https://www.dea.gov/mission
[35] https://www.justice.gov/jmd/page/file/1033151/download

### E.  Plaintiffs Need DEA Regulatory Services to Engage in Free Exercise

**70.**  DEA regulatory services are necessary to give substance to the Free Exercise rights of AYA, its congregation, NAAVC, its member churches, and their congregations.

### F.  The DEA's Policy of Denying Regulatory Services to Visionary Churches

**71.**  The DOJ has at all times exerted control over all of the DEA's decision-making in the field of visionary religion, and all unconstitutional or otherwise unlawful acts alleged against the DEA herein are equally alleged against the DOJ.  The DEA had and has a policy of denying regulatory services to visionary churches and refusing all requested religious exemptions from the CSA until and unless compelled by court order (the "Policy").  The Policy was developed and applied by various DOJ and DEA Government employees whose names are yet unknown, with conscious disregard for the First and Fourteenth Amendment rights of AYA and its congregation, NAAVC, its member churches, and the member-church congregations.  The Policy informed the DEA's institutional commitment to maintain that a total prohibition on controlled substance use is the least restrictive way of advancing the Government's policy against illicit drug use, despite having been informed by the Supreme Court to the contrary in *O Centro*.[36]  The DEA and the DOJ falsely equate the Policy with the "closed system of regulation," and by mantric repetition of the quoted phrase, subject the decisions of the Supreme Court to their own, unconstitutionally obstructive interpretations of the law.

**72.**  The Policy precludes issuing exemptions from the CSA and 21 CFR 1300 *et. seq.*, for religious purposes.  DEA's reports to oversight agencies show no staffing expenditures for employees to consider the needs of churches and religious persons seeking exemptions from the CSA on religious grounds.  DEA has no individuals uniquely tasked with evaluating requests for exemptions from the CSA on religious

---

[36] "Also rejected is the Government's central submission that, because it has a compelling interest in the *uniform* application of the Controlled Substances Act, no exception to the DMT ban can be made to accommodate the UDV." *O Centro*, 546 U.S. 418, 423, 126 S. Ct. 1211, 1216.

grounds. The DEA's lack of preparation to provide regulatory services to religious exemption seekers stands in marked contrast to the assiduous nature of the DEA's preparation to deal with illicit drug enforcement and pharmaceutical regulation.

**73.** The DEA thoroughly studies the activities of criminal entities and regulatory clients, produces reports that announce what its agents and attorneys have learned, and announces initiatives about how it will put its new knowledge to work to accomplish its mission policing the illicit drug trade and regulating medical, manufacturing, and research registrants.

**74.** Through its website at DEA.gov, the DEA treats medical, pharmaceutical, manufacturing, research, and law enforcement regulatory clients as valued customers, providing convenient online systems where they can log in and perform their work involving controlled substances. The DEA website provides secular regulatory clients with webpages for account-creation, online access to submit reports, and automated process to obtain legally-required forms required for lawful importation, distribution, and dispensing of controlled substances.

**75.** By contrast, the DEA has entirely avoided provisioning itself to provide regulatory services to the seekers of CSA exemptions because, pursuant to the Policy, it will not provide any.

**76.** The Policy is also a notable deviation from the Government's otherwise consistent advocacy in favor of the rights of churches and religious freedom principles, evidenced by the many cases in which it has intervened, filed amicus briefs, and statements of interest in support of Free Exercise, as detailed at the USDOJ's "Religious Freedom in Focus" webpage.[37]

**77.** The Policy has dominated the DEA's conduct, causing it to be deceptive when it has given signals of softening its position, engaging in apparent negotiation with both the UDV and the Daime, and simultaneously planning seizures of sacramental Ayahuasca from both churches. In May 1999, while a DOJ task force established by Attorney

---

[37] https://www.justice.gov/crt/religious-freedom-focus-volume-84-january2020#montana

General Janet Reno was negotiating with both the UDV and the Santo Daime, the DEA staged coordinated raids on the Santo Daime and the UDV, arresting Jonathan Goldman in rural Oregon and seizing a drum of the Daime's Ayahuasca on May 20, 1999, and seizing the UDV's Ayahuasca in New Mexico on the very next day, May 21, 1999.[38] Thus ended badly the efforts of the two visionary churches to "lay their cards on the table" while negotiating with the DEA and the DOJ.

78.   The DEA declined to prosecute Goldman, but consistent with the Policy, continued to engage in prosecutorial threats, allowing the Damoclean sword to dangle over the Oregon Santo Daime congregation's head for another eight years, until at last they could bear the threat to their Free Exercise no longer.  Finally, on September 5, 2008, the Daime Church and six members of the Ashland, Oregon congregation (none of whom had been arrested or had property seized from their possession) filed their RFRA lawsuit.

79.   During the Daime litigation, the Policy was on display repeatedly.  Unlike in the UDV litigation, where the DEA conceded the sincerity of the UDV church's faith, the DEA made a serious effort to portray Goldman as a multiple drug user under suspicion for other drug offenses, and manifested committed hostility to the Santo Daime's position until the final imposition of the Court's injunction barring further enforcement activity.

### G.  DEA Regulatory Regimes Imposed by Statute or Injunction

80.   As alleged hereinabove, under the Policy, the DEA denies regulatory services to visionary churches until compelled to act by force of law.  The DEA peyote regulatory system was devised exclusively for the benefit of the Native American Church ("NAC").  The DEA established the peyote regulatory system pursuant to statutory authorization.  The DEA manages two other regulatory schemes for importation and distribution of large

---

[38]  "On May 21, 1999, United States Customs Service agents seized a shipment of hoasca labeled 'tea extract' bound for Jeffrey Bronfman and Uniao do Vegetal-United States." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1175 (10th Cir. 2003). "On or about May 20, 1999, the defendants intercepted a shipment of the Holy Daime tea lawfully sent from the Santo Daime Church in Brazil to plaintiff Goldman…."Complaint, Docket # 1, ¶¶ 25 and 26 at page 8, filed 09/05/08 in *Church of the Holy Light of the Queen v. Mukasey*, Oregon District Court Case No. 1:08-cv-03095-PA.

quantities of Ayahuasca for the UDV and the Santo Daime, pursuant to District Court injunctions, having negotiated the particulars of the regulatory systems with the two Brazilian churches separately.

### a.   The  Peyote Regulatory Regime Was Allowed by Statute

**81.**   The DEA's authorization to establish a peyote distribution regime appears in 42 U.S.C. § 1996a, that makes lawful the "use, possession or transportation of peyote by an Indian for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion."[39]  The section permits "such reasonable regulation and registration by the Drug Enforcement Administration of those persons who cultivate, harvest, or distribute peyote as may be consistent with the purpose of this Act."[40]  The DEA regulatory regime thus covers the distribution of peyote from its sole point of origin in Texas, where "peyoteros" registered with the DEA collect the sacred cactus and may lawfully deliver it to any Native American who presents a "Certificate of Indian Blood."[41]  Neither the Native American Church ("NAC") nor its branch churches register with the DEA, and the last DEA registrant to handle a peyote button in the supply chain is the DEA-licensed peyotero.  The NAC and its congregants are not subject to DEA registration or any other regulatory requirements.

### b.   The UDV Regulatory Regime Was Required by Injunction

**82.**   The DEA has regulated the importation and distribution of Ayahuasca by the Uniao do Vegetal (the "UDV") since 2006, when the Supreme Court upheld the New Mexico District Court's grant of the UDV's motion to preliminarily enjoin the DEA from interfering with its importation of Hoasca.  The UDV is a very large church with many practitioners that imports tea in barrels from Brazil, and its relationship with the DEA is the subject of a settlement agreement that imposes security, recordkeeping, and disclosure obligations on the UDV.

---

[39] 42 U.S.C. § 1996a(b)(1).
[40] 42 U.S.C. § 1996a(b)(2).
[41] https://www.texasstandard.org/stories/in-the-only-state-where-selling-peyote-is-legal-the-cactus-is-threatened-and-still-controversial/

### c.  The Santo Daime Regime Was Required by Injunction

**83.**  The Santo Daime, another church with Brazilian origins, sought and won an exemption from the CSA in *Church of the Holy Light of the Queen v. Mukasey*.[42]  Since then, the Santo Daime has imported large quantities of Ayahuasca for distribution to Santo Daime churches, under license granted pursuant to RFRA exemption.

### d.  The UDV and Santo Daime Regulatory Regimes Provide No Jurisdictional Basis for Regulating Plaintiffs

**84.**  The regulatory regimes established by the DEA with the UDV and the Santo Daime resulted from settlement agreements after the DEA was judicially enjoined to provide regulatory services to the two Brazilian churches.  Those regulatory regimes thus provide no jurisdictional basis for the DEA to impose regulatory compliance requirements on plaintiffs.[43]

### H.  The DEA's "Guidance" Is A Pretext to Deny Plaintiffs Regulatory Services and Deter Visionary Churches from Filing RFRA Lawsuits

**85.**  Notwithstanding its commitment to the Policy, the DEA publicly contends that it opened an avenue to obtaining an exemption from the CSA in January 2009 in a publication downloadable from the DEA's website, and styled as a "Guidance" document.[44]  The DEA contends that the Guidance is an administrative remedy that must be exhausted before a plaintiff may file a RFRA action.  However, the Guidance was not adopted pursuant to rulemaking with notice-and-comment under 5 U.S.C. § 553 of the Administrative Procedure Act (the "APA"), and was never published in the Federal

---

[42] *Church of the Holy Light of the Queen v. Mukasey*, 615 F.Supp.2d 1210 (Oregon 2006).

[43] "Agencies may impose legally binding requirements on the public only through regulations and on parties on a case-by-case basis through adjudications, and only after appropriate process, except as authorized by law or as incorporated into a contract."  *Promoting the Rule of Law Through Improved Agency Guidance Documents*, Executive Order 13891, 84 Federal Register 55235 (Oct. 9, 2019).

[44] The *Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act* was not published in the Federal Register, but based on a digital date of creation found in the pdf document, was published in January 2009, https://www.deadiversion.usdoj.gov/pubs/rfra_exempt_022618.pdf.

Register. Accordingly, the Guidance provisions are not regulations, lack all independent force of law, and impose no exhaustion requirement.[45]

**86.**  RFRA allows plaintiffs to seek protection from laws and regulations that impose prior restraints upon, or chill Free Exercise and Free Religious Expression by threat of criminal or regulatory sanctions.  The DEA has no statutory authority under either the CSA or RFRA to regulate Free Exercise by judging which visionary religion is sincere and which is not.[46]  The DEA interposed the Guidance to deter visionary churches from filing RFRA lawsuits.  RFRA allows plaintiffs to seek protection from laws and regulations that impose prior restraints upon, or chill Free Exercise and Free Religious Expression by threat of criminal or regulatory sanctions.  The Guidance, as alleged in detail hereinbelow, accomplishes precisely the opposite – it imposes a prior restraint on Free Exercise pending review of every petition, and petitions go unprocessed for years.

**87.**  The DEA issued the Guidance without jurisdiction or lawful basis, under color of law to further the Policy, with the purpose and effect of frustrating the Free Exercise rights of those persons and visionary churches seeking exemption from the CSA to consume communion sacraments that contain controlled substances.

/ / /

/ / /

/ / /

---

[45] "The Manual and Handbook are not promulgated in accordance with the procedural requirements of the Administrative Procedure Act. Neither is published in the Federal Register or the Code of Federal Regulations.  They are not subjected to notice and comment rulemaking; they are not regulations. *** We hold that the Manual and Handbook do not have the independent force and effect of law." _W. Radio Servs. Co. v. Espy_, 79 F.3d 896, 901 (9th Cir. 1996), *citations omitted*; (affirming District Court's retention of jurisdiction on grounds that manual and handbook imposed no administrative exhaustion requirement).

[46] "There is no allowance for a 'certificate of registration' from the DEA for constitutionally protected religious exercise, which is not contemplated as a registered activity under the CSA and administration regulations.  In other words, the DEA RFRA Guidance establishes a new, substantive requirement for DEA registration for religious exercise where none currently exists under Federal law." B.Bartlett, *The U.S. Drug Enforcement Administration Problematic Process for Religious Exemption for Use of Prohibited Psychoactive Substances* (July 16, 2019). https://tinyurl.com/y8kplc73

### I.   The Guidance Imposes an Unconstitutional Prior Restraint on Free Exercise

**88.**   Paragraph 7 of the Guidance provides:  "No petitioner may engage in any activity prohibited under the Controlled Substances Act or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration." Paragraph 7 of the Guidance imposes an unconstitutional prior restraint on Free Exercise under color of  law upon those who would petition the DEA for an exemption from the CSA.

### J.   The Guidance Adjudication Process Substantially Burdens Free Exercise

**89.**   The Guidance establishes an adjudicative body (the "Guidance Adjudicator") that works in secret to determine the validity of any applicant's claim of religion in order to determine their entitlement to Free Exercise of Religion.  The identity or qualifications of the Guidance Adjudicator are not disclosed.

**90.**   The DEA has drafted no rules to guide the activities of the Guidance Adjudicator. There is no timeline for processing an application, and inquiries to the DEA regarding the status of applications that have been pending for over two years go unanswered.  The Guidance Adjudicator has unfettered authority to delay decision indefinitely, which renders the process a sham.

**91.**   The Guidance Adjudicator may request "additional information" of an applicant as a condition of processing an application, and may dismiss any application if the applicant declines to respond to a request for additional information.  The Guidance leaves the term "additional information" open to unlimited interpretation, and thus presents an unlimited basis for overreaching demands and pretextual dismissals.

**92.**   The Guidance provides no avenue for a prompt final judicial determination of the validity of the Guidance Adjudicator's decision.

**93.**   The Guidance Adjudicator's activities chill the Free Exercise of visionary churches who are the targets of the Guidance process, particularly by using the Guidance to compel disclosure of internal church operations, and subjecting them to prior restraint of

Free Exercise. The Guidance Adjudicator has used the Guidance to infringe Free Exercise, and entangle the Government in unconstitutional regulation of religion in violation of the Establishment Clause.[47]

**K. The Guidance Lays a Large, Useless Financial Burden Upon Free Exercise**

**94.** The Guidance imposes a financial barrier for visionary churches, because no church would submit a Guidance-compliant petition to the DEA without first consulting with informed legal counsel.

**95.** A visionary church board of directors seeking a formal opinion of counsel to proceed with submission of a Guidance-compliant petition to the DEA would be required to fund considerable research into Constitutional and administrative law.

**96.** AYA has learned this by direct experience, having first engaged legal counsel to prepare a petition under the Guidance, only to learn that submitting a petition would waive the Fifth Amendment rights of the Founder, subject the entire congregation to an interruption in Free Exercise due to paragraph 7 of the Guidance, and expose the congregation to potential criminal enforcement based on the contents of a petition. Further, as is alleged *infra* at paragraph 103, eventually the DEA's failure to even process petitions became widely known, and it became apparent that assuming substantial burdens in order to file a petition under the Guidance would never produce the promised "Certificate of Exemption." Accordingly, AYA did not submit a petition, and instead chose to exercise its statutory rights under RFRA to obtain a judicial ruling of exemption. AYA thus discovered, after considerable legal expense, claimed as damages herein, that the Guidance was simply a blind alley created by the DOJ and DEA in conscious disregard of the Free Exercise rights of visionary churches, to consume their time, resources, and funds, while adhering to the central directive of the Policy – denying regulatory services to visionary churches until compelled by judicial order.

---

[47] *Surinach v. Pequera de Busquets*, 604 F.2d 73 (1st Cir. 1979)(quashing subpoena from Puerto Rican Government agency to the Superintendents of the Roman Catholic schools on Establishment and Free Exercise grounds).

97.  Plaintiffs AYA and its congregation, NAAVC, and NAAVC's member churches and their congregations, have been damaged by being required to pay legal fees to discover that the Guidance was merely a ruse that a visionary church careful of its Free Exercise rights would avoid as a matter of self-protection.

### L.  The Guidance Substantially Burdens Free Exercise When Used As a Pretext for Issuing *de facto* Stop Orders and Administrative Subpoenas

98.  The DEA has on two occasions "invited" visionary churches to submit petitions for RFRA exemptions from the CSA.

99.  Christopher Young and Soul Quest Church of Mother Earth Inc. ("Young and Soul Quest") were one of the church leaders and churches targeted by the DEA's *de facto* administrative subpoena and cease and desist order, the opening to which states, in relevant part:

> It has come to our attention that prior to August 4, 2016, you were involved in offering "retreat" through your website, www.soulquest-retreat.com, at which you provided Ayahuasca and other controlled substances to your clientele.

100. Placement of the word "retreat" in quotations, and reference to church congregants as "clientele" clearly implied that the DEA was seeing the church's activities through the skeptical lens of drug traffic surveillance.

101. The attorneys for Young and Soul Quest notified the DEA that the "correspondence advised my client to cease and desist the use of Ayahuasca as a sacrament," and therefore "the Church and its members are wholly unable to exercise their sincere religious beliefs."  This result was in conformity with the DEA's wishes, as the agency tacitly acknowledged by saying nothing about Young and Soul Quest's complaint that the cease and desist order infringed their Free Exercise when it responded to their attorney's letter with the assurance that the "DEA implements its petition process in full compliance with the requirements of RFRA.  Since RFRA provides no instructions to any administrative agency regarding how to process an application for exemption, this statement had no meaning; however, the DEA's knowing, silent persistence in its Policy of imposing prior

restraints to chill the Free Exercise rights of Young and Soul Quest displayed its conscious indifference to the Free Exercise rights of any and all visionary churches.

102. Young and Soul Quest, and another visionary church, Ayahuasca Healings Native American Church, submitted "petitions for exemption" to the DEA.  The Ayahuasca Healings petition lists five individuals who all jointly disclosed the range of their activities distributing Ayahuasca, thus waiving their Fifth Amendment right to be free of self incrimination, and admitting to a series of actions that, absent exemption, would expose them to considerable criminal penalties for operating a drug distribution conspiracy.  By submitting petitions, they sought to bargain for rights of Free Exercise by waiving or surrendering other constitutional rights.  It was an unconstitutional violation of the rights of those visionary churches and their leaders for the DEA to force them to choose which constitutional rights to surrender – their Free Exercise, or their personal rights to be free of compelled self-incrimination.  It was a further unconstitutional violation, committed with conscious disregard for the rights of the petitioners, for the DEA to solicit and receive the petitions, then provide no response whatsoever, leading the petitioners to dangle in legal uncertainty for years.  The negative message to the visionary church community was unmistakable, and consistent with the Policy.

103. The issuance of the invitations to submit petitions resulted in the disclosure of detailed inculpatory information from the invitees by an implied threat of criminal prosecution, in violation of the Fifth Amendment rights of the individuals who submitted the petitions.  The pretextual nature of the invitations has become apparent as years have passed since the petitions were submitted under duress, and since submitting their petitions, neither petitioner has received a reply communication, notwithstanding their repeated efforts to elicit a response from the DEA.

104. The clear import of the DEA's "invitations" to submit exemption applications was to order the churches targeted for invitation to cease and desist from their religious practice.

105. The Guidance Adjudicator thus adhered to the Policy by violating the civil rights of visionary churches with conscious indifference, using the Guidance to issue *de facto* stop

orders and administrative subpoenas that have the effect of imposing a system of unlawful prior restraint upon the Free Exercise of religion.[48]

### M. The Guidance Substantially Burdens Free Exercise by Extracting Inculpatory Statements from Visionary Church Leaders

**106.** The Fifth Amendment's prohibition on compelled self-incrimination guarantees every natural person in the United States that he or she "shall [ not] be compelled in any criminal case to be a witness against himself." A noted constitutional scholar has written:

> The privilege historically goes to the roots of democratic and religious principle. It prevents the debasement of the citizen which would result from compelling him to "accuse" himself before the power of the state. The roots of the privilege … go to the nature of a free man and his relationship to the state. [49]

**107.** Administrative regimes that attempt to institute compelled self-disclosure of prosecutable conduct under the rubric of taxation or regulatory reporting are unconstitutional violations of the Fifth Amendment prohibition on compelled self-incrimination.[50]

**108.** To submit a Guidance-compliant application for an exemption from the CSA on religious grounds, a representative of the applicant church must sign an application under penalty of perjury that discloses activities that expose the signatory and the church congregation to potentially severe criminal penalties under the CSA.

**109.** The Guidance thus demands a waiver of Fifth Amendment right against self-incrimination from the leaders of any visionary church who would be required to submit

---

[48] *Cantwell v. Connecticut*, 310 US 296 (1940).

[49] McKay, *Self-Incrimination and the New Privacy, citing United States v. Wade*, 388 U.S. 218, 261 (1967). The Supreme Court Review, Vol. 1967 193, 210 (1967)(emphasis added).

[50] The Wagering Act was held unconstitutional because "[t]he terms of the wagering tax system make quite plain that Congress intended information obtained as a consequence of registration and payment of the occupational  tax to be provided to interested prosecuting authorities." *Marchetti v. United States*, 390 U.S. 39, 58-59, 88 S. Ct. 697, 708, 19 L.Ed.2d 889, 904 (1968). *See also Leary v. United States*, 395 U.S. 6, 10, 89 S. Ct. 1532, 1534, 23 L.Ed.2d 57, 66 (1969)(federal Marihuana Tax Act held unconstitutional as compelling self-incrimination under guise of taxing regime).

an application for exemption under penalty of perjury disclosing matters that will subject them to the risk of enforcement, prosecution, imprisonment, and seizure of property.

**110.** The Guidance demands disclosure of self-inculpating information under oath, information individuals are privileged not to divulge under coercion due to the Fifth Amendment prohibition on compelled self-incrimination. Associational groups may not be required to disclose their membership lists when it would expose the members to prosecution, and the associational group has standing to assert the Fifth Amendment rights of its members.[51]

**111.** While the Fifth Amendment privilege against self-incrimination inures to the benefit of natural persons only, membership organizations may assert the Fifth Amendment rights of their members, and AYA here asserts the Fifth Amendment rights of its members on their behalf. NAAVC's member churches have standing to seek redress of Fifth Amendment injury to their congregations, and NAAVC asserts that standing herein on behalf of those individual congregants of its member churches whose Fifth Amendment rights stand at risk.

**112.** The Guidance procedure does not protect the applicant from the risk that the Guidance Adjudicator may share inculpatory information submitted by an applicant for religious exemption with the DEA's enforcement agents and prosecutors.

### N. The Guidance Remains Extant Because the DEA Ignored the AG's *Memorandum on Federal Law Protections for Religious Liberty*

**113.** On May 4, 2017, the President of the United States issued EO 13798, *Promoting Free Speech and Religious Liberty*,[52] and shortly thereafter, Attorney General Jeff Sessions published his *Memorandum on Federal Law Protections for Religious Liberty*,[53] that outlined how the DEA and other agencies must proactively accommodate the needs

---

[51] *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 86 S. Ct. 194, 15 L.Ed.2d 165 (1965(American Communist Party secured injunction on behalf of undisclosed members to prevent disclosure of identities, that would have lead to prosecution, since Party was illegal).
[52] 82 Federal Register 21675 (May 4, 2017).
[53] 82 Federal Register 49668 (Oct. 26, 2017).

of religious groups seeking exemptions from general law. The *Memorandum* directed

agencies to review old policies affecting the rights of religious groups and bring them

into compliance with RFRA and the principles outlined in the *Memorandum*.  The

*Memorandum* emphasized that RFRA requires every federal agency, in every aspect of

their activity, to be mindful of the need to avoid interfering with Free Exercise:

> "Except in the narrowest circumstances, no one should be forced to choose between living out his or her faith and complying with the law. Therefore, to the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all Government activity…."

114. Hewing to the Policy it has pursued under color of law in conscious disregard of the

Free Exercise rights of plaintiffs, the DEA effectively ignored AG Sessions, making no

changes to the Guidance in response to the Attorney General's exhortations.  As noted

hereinbelow, the DEA has not answered correspondence from NAAVC, displaying

conscious indifference to the Free Exercise rights of the visionary church community, an

attitude antithetical to that which AG Sessions thought to inculcate by writing and

circulating the *Memorandum* to the DOJ and the DEA.

### O.  The Guidance Wasn't Reviewed by the DEA As Required by EO 13891

115. On October 15, 2019, the President issued Executive Order 13891, *Promoting the

Rule of Law Through Improved Agency Guidance Documents*.  To remedy the abuse of

administrative agency guidance documents that subject the public to *ad hoc* rulemaking

without the notice-and-comment procedure required by the Administrative Procedure

Act, the Office of Management and Budget ("OMB") issued an Implementing

Memorandum (the "OMB Implementing Memo") pursuant to EO 13891 that directed all

federal administrative  agencies to review all extant guidance documents.[54]  The OMB

Implementing Memo set a February 28, 2020 deadline for administrative agencies to

either rescind existing guidance documents, or affirm their continued vitality and publish

---

[54] "Within 120 days of the date on which OMB issues an implementing memorandum under section 6 of this order, each agency shall review its guidance documents and, consistent with applicable law, rescind those guidance documents that it determines should no longer be in effect."  EO 13891, 84 Federal Register 55235, 55236 (Oct. 9, 2019).

them on a special website.  That special website was required to bear a legend informing the public that a guidance document "does not bind the public, except as authorized by law or as incorporated into a contract."  Thus, EO 13891 and the OMB Implementing Memo targeted deficient guidance documents for rescission on February 28, 2020.

116. EO 13891 forbids agencies from using guidance documents to promulgate law, and the OMB Implementing Memo explicitly condemns the use of guidance documents to coerce compliance with  administrative demands, such as the DEA did when it coerced disclosures from visionary churches under the cloak of "invitations" to submit petitions for exemption, as above alleged.[55]

117. Presuming that the then-impending February 28, 2020 deadline imposed by the OMB Implementing Memo would put the DEA to a decision about whether to carry on with the Guidance as DEA policy, or to rescind it, NAAVC sent a letter to the DEA on behalf of its member churches, citing EO 13891 and other sources of law, recommending that the DEA review the Guidance as required by the Executive Order, and rescind it.

118. The DEA has taken no action required by EO 13891.  It has not rescinded or reaffirmed the Guidance.  It has not created a webpage with all other DEA guidance documents bearing the legend required by the OMB Implementing Memo.

119. Pursuant to the executive authority of the President as set forth in EO 13891 and the OMB Implementing Memo, the Guidance has been affirmatively withdrawn as the policy of the Government; however, the DEA refuses to acknowledge it.

120. The DEA has not responded to NAAVC's letter, notwithstanding that attorneys within the DEA and the DOJ, including defendant Thomas Prevoznik, have reviewed the

---

[55] "Nor should agencies use guidance documents-including those that describe themselves as non-binding effectively to coerce private-party conduct, for instance by suggesting that a standard in a guidance document is the only acceptable means of complying with statutory requirements, or by threatening enforcement action against all parties that decline to follow the guidance."  *Memorandum for Regulatory Policy Officers at Executive Departments and Agencies and Managing and Executive Directors of Certain Agencies and Commissions*, October 31, 2019, from D.J. Mancini, Acting Administrator, Office of Information and Regulatory Affairs.

letter and are aware of the DEA's obligations under EO 13891 and the OMB

Implementing Memo.

### P.  The President Rescinded the Guidance

**121.** EO 13891 states in relevant part:

> No agency shall retain in effect any guidance document without including it in the relevant database referred to in subsection (a) of this section, nor shall any agency, in the future, issue a guidance document without including it in the relevant database. No agency may cite, use, or rely on guidance documents that are rescinded, except to establish historical facts.

**122.** Accordingly, the Guidance was affirmatively withdrawn as the policy of the Government by the Chief Executive, and is unenforceable by the Government.  Any attempt to impute the authority of law to the Guidance would run directly contrary to the President's directives and the Administrative Procedure Act, and is therefore precluded.

## VI.  FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
## Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(c)

**123.** Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

**124.** Drinking sacramental Ayahuasca is the central communion ceremony of AYA.  In AYA communion, congregants receive the transmission of wisdom and Divine Love that comes through sacramental use of Ayahuasca.  Without Ayahuasca, AYA does not have a religious practice to share, and AYA congregants are unable to practice their religion.  AYA's religious belief is sincere, and its practice of drinking sacramental Ayahuasca has been deemed a lawful practice worthy of protection under the Free Exercise clause of the First Amendment.

**125.** AYA, its congregation, NAAVC, and NAAVC's member churches and congregations are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA, that impose criminal penalties for violations.

**126.** The effect of the said provisions of the CSA is to coerce AYA and NAAVC to act contrary to their religious beliefs by the threat of criminal sanctions.  The potential for

prosecution under the CSA places substantial pressure on AYA, its Founder, and the congregation to modify their behavior and violate their beliefs, forcing them to choose between either abandoning religious principle or risking criminal prosecution.

**127.** NAAVC is substantially burdened in its efforts to engage in Free Exercise by sharing the Ayahuasca communion sacrament with exempt churches, and its ministry to visionary churches is substantially burdened, because many very sincere congregations and their leadership are accustomed to practicing "underground," and are uncertain whether associating with a church association to advance the rights of visionary churches will accomplish the desired goal of greater Free Exercise, or stimulate DEA enforcement.

**128.** The mission of the DEA, as set forth *supra,* places AYA and NAAVC squarely within the scope of its stated enforcement activities.  Accordingly, AYA and its congregation, and NAAVC and its member churches are in peril of prosecution.

**129.** Without an exemption from specified sections of the CSA and related regulations, AYA, the Founder, and its members fear prosecution for importing, manufacturing and dispensing Ayahuasca.

**130.** On April 22, 2020, NAAVC and AYA were notified that their joint property, a container of Ayahuasca ordered for the use of NAAVC and AYA, had been seized by DHS during the customs process.  DHS notified NAAVC and AYA's designated addressee of the seizure of NAAVC and AYA's property by sending a notice in the empty box from which the Ayahuasca had been removed.  DHS sent the empty box to NAAVC and AYA's designated agent at their mailing address in the State of California, in lieu of an international  parcel, stating:

<u>NOTICE</u>

NARCOTICS AND/OR OTHER CONTRABAND PROHIBITED FROM ENTRY INTO THE UNITED STATES HAVE BEEN SEIZED AND REMOVED FOR APPROPRIATE ACTION UNDER 19CFR145.59. YOU WILL BE RECEIVING CORRESPONDENCE FROM OUR FINES, PENALTIES AND FORFEITURES BRANCH IN THE NEAR FUTURE.

**131.** Without an exemption under 21 CFR 1312.11, NAAVC and AYA risk repeated seizure of its sacrament by the DHS, administrative sanctions, and referral of the matter to the DEA for prosecution for violation of 21 U.S.C. § 952(a).

**132.** There exists a clear and present danger: (1) that AYA and its members may be arrested for violations of the CSA, (2) that warrants could be issued for the arrest of AYA and its members, (3) that warrants may be issued allowing the search of AYA properties or that of its members, and (4) that AYA's sacramental Ayahuasca may be seized during the importation, manufacturing, or dispensing process.

**133.** AYA and its members are aggrieved by this situation, that forces them to procure, share and celebrate their communion sacrament secretly, and to risk the loss of liberty and the personal anguish and humiliation of bearing an unmerited stain of criminality, in order to engage in the Free Exercise of religion protected by the First Amendment.

**134.** The Government has no compelling interest in prohibiting AYA from using Ayhauasca as a religious sacrament.

**135.** The Government is required to utilize the least restrictive means to accomplish its legitimate interests by granting AYA an exemption from the criminal prohibitions of the CSA on importation, distribution and dispensing of Ayahuasca.  Importation of Ayahuasca requires an Importation Permit issued under 21 CFR 1312.12, a regulatory service available only to DEA registrants who have been assigned a DEA number for use in submitting applications for permits.  AYA needs to be assigned a DEA number to obtain regulatory services necessary to supply sacramental Ayahuasca to its congregation.

**136.** Application of § 841(a)(2) and §952(a) of the CSA and related federal regulations to AYA is not the least restrictive means for the Government to accomplish its interests in preventing the illicit distribution of controlled substances.

**137.** AYA is entitled to a decree establishing its right to exemptions from the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA.  AYA is further entitled to

register with the DEA as an exempt person under 21 CFR 1312.11, and to receive all further administrative clearances necessary to eliminate substantial burdens on AYA's Free Exercise rights.

**138.** NAAVC and NAAVC's member churches and congregations are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA.

**139.** NAAVC and NAAVC's member churches and congregations are substantially burdened by the DEA's denial of regulatory services to visionary churches, and its Policy of doing nothing that would assist them to obtain DEA Numbers that would eliminate the substantial burdens on Free Exercise imposed by the prohibitions on importation and distribution of sacramental Ayahuasca.

**140.** NAAVC is entitled to pursue importation and distribution of sacramental Ayahuasca as Free Exercise.

**141.** To enable its Free Exercise, NAAVC is entitled to receive exemptions from the prohibitions on manufacturing, distributing, or dispensing Ayahuasca, that contains a controlled substance in § 841(a)(2), and by the prohibition on importation in § 952(a) of the CSA.

**142.** NAAVC is entitled to be granted a DEA Number for use in obtaining importation permits to import sacramental Ayahuasca for distribution to exempt visionary churches.

**143.** If defendants are not enjoined, plaintiffs will suffer irreparable harm for which they have no remedy at law.  The requested injunction will serve the public interest in protecting Free Exercise from prior restraint and *post-hoc* detention, prosecution, and punishment.

**144.** Plaintiffs have been damaged by the unconstitutional Policy that has presented the Guidance as a genuine path to regulatory services from the DEA, when in truth it is merely a blind alley intended to induce visionary churches to misdirect their efforts.

**145.** AYA, NAAVC and NAAVC's member churches and congregations are substantially burdened by the DEA's use of the Guidance to issue *de facto* demands for disclosure of

information that is protected from compelled disclosure by the Fifth Amendment privilege against self incrimination, and by the First Amendment Establishment Clause prohibition on Government regulatory entanglement in a religion's internal affairs.

**146.** Thomas Prevoznik has been responsible during the last two years for the maintenance of the Policy, which he has expressed in the DEA's refusal to review and rescind the Guidance pursuant to EO 13891 and the OMB Implementing Memo; for the DEA's refusal to correspond with NAAVC.

**147.** AYA and NAAVC's member churches and congregations have been damaged by the acts, motivated by conscious indifference to the rights of Plaintiffs and all visionary churches, that Thomas Prevoznik took pursuant to the Policy and in violation of RFRA, to keep the Policy and the Guidance in place, and to continue denying regulatory services to visionary churches. AYA and NAAVC's member churches and congregations have been damaged by expending substantial legal fees to discover that the Guidance presented a risk to the Free Exercise and Fifth Amendment rights of visionary churches and their leadership, rather than, as the DEA represented, a genuine path to regulatory services necessary for Free Exercise. For the cost of unearthing that deception, plaintiffs are entitled to damages equal to the attorney's fees expended.

## VII. SECOND CLAIM FOR RELIEF AGAINST DEFENDANT
### Review of Administrative Action, 5 U.S.C. § 702

**148.** Plaintiffs re-allege and incorporate by reference each and every allegation set forth herein as if set forth in full hereat.

**149.** The DEA's concerted denial of regulatory services to churches that practice visionary religion is subject to the presumption of reviewability, and no statute precludes review.[56] The Policy that supports the denial of regulatory services, and the Guidance adopted in furtherance of the Policy, are contrary to constitutional right, privilege or

---

[56] "As we explained recently, 'legal lapses and violations occur, and especially so when they have no consequence. That is why this Court has so long applied a strong presumption favoring judicial review of administrative action.'" *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361, 370, 202 L.Ed.2d 269, 281 (2018).

immunity,  in excess of statutory jurisdiction, authority or limitations, and were carried on without the procedure required by law.

**150.** Plaintiffs seek review of the DEA's use of the Guidance as a tactic for the Policy of denying regulatory services to visionary churches and refusing all requested religious exemptions from the CSA until and unless compelled by court order.  This Policy and the Guidance were drafted and put into practice with conscious disregard for the First Amendment Free Exercise and Fourteenth Amendment due process rights of plaintiffs and other visionary churches and church associations, as well as the Fifth Amendment rights of church leaders and congregations.  The Policy was therefore unconstitutional and resulted in agency inaction that is reviewable under 5 U.S.C. § 702.

**151.** The Government, through its administrative agency, the DEA, is obliged to treat plaintiffs' claims for religious exemption from the CSA and the DEA's regulatory requirements in the Code of Federal Regulations in the same way as it treats secular requests for regulatory services.[57]  However, it has not.  A site-specific Google search of DEA.org for references to "religious exemption" or "RFRA exemption" will find nothing but the Guidance, which as alleged hereinabove, is merely a ruse published to further the Policy.

**152.** The DEA website is conspicuously solicitous of the needs of secular registrants, providing webpages for account-creation, online access to submit reports, and automated process to obtain legally-required forms required for lawful importation, distribution, and dispensing of controlled substances.

**153.** NAAVC and NAAVC's member churches utilizing Ayahuasca as their sacrament are deprived of their right of Free Exercise of religion by the DEA's conscious indifference to their need to receive religious exemptions to secure an exemption from the CSA proscriptions on importation, distribution and dispensing.  Fourteen years after the Supreme Court announced that Ayahuasca churches that adhere to best practices could obtain CSA exemptions under RFRA, the DEA adheres to the Policy of denying

---

[57] *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004).

visionary churches regulatory services by failing to adopt a religious CSA exemption to list next to the exemptions for medical, pharmaceutical and law enforcement workers at 21 CFR 1301.22 – 1301.24, inclusive.  The exemptions from the prohibitions on possession of controlled substances adopted by the DEA in the above CFR sections are as subject to abuse as an exemption for religious purposes, if not more so.  Police officers have abused their exemption to plant drugs on suspects, and commit other crimes.[58] Medical personnel, likewise, have misused their exemptions.

**154.** The DEA created and used the Guidance to further the Policy of denying regulatory services to visionary churches, with conscious disregard for the disparate impact the Guidance would have and had on the efforts of plaintiffs and other visionary churches and church associations to obtain regulatory services from the DEA on grounds of religious exemption.

**155.**  A law that burdens religiously motivated conduct is not neutral, and must satisfy strict scrutiny.[59]   Applying strict scrutiny to the Guidance means considering whether it was the least restrictive way of handling the process of issuing exemptions pursuant to RFRA – the stated purpose of the document.  The Guidance is not the least restrictive means of advancing the Government's compelling interest in providing religious exemptions to visionary churches.  Nor is it the least restrictive means of  preventing diversion of sacramental Ayahuasca into the illicit market.  Accordingly, it fails to pass strict scrutiny.

**156.** Pursuant to the Policy, the DEA has denied religious claimants regulatory services equivalent to the services it provides to secular DEA registrants.  Physicians, pharmacies, drug manufacturers, and importers and exporters of controlled substances are treated like valued customers at the DEA.gov website; whereas, the needs of religious exemption-seekers are addressed only by the deceptive Guidance.

---

[58] *Eg., United States v. Cortes-Caban,* 691 F3d. 1 (1st Cir. 2012 (officers convicted of CSA violations after they abused exemptions under 21 U.S.C. § 885(d) and the related CFRs).
[59] *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004).

**157.** By giving full weight to the needs for secular exemptions from the CSA and DEA regulations, and ignoring the needs of churches and religious groups for those services, the DEA has established a regulatory system that has a disparate impact upon them.  Such regulatory schemes, due to their disparate impact, are violations of the First Amendment Free Exercise rights of religious persons.

**158.** After receiving EO 13891, the OMB Implementing Memo, and NAAVC's letter, the DEA was under a duty of which it was fully aware, imposed by the President in his authority as the head of the Executive Branch, to rescind the Guidance under the legal doctrines set forth in the Administrative Procedure Act, EO 13891 and the OMB Implementing Memo.

**159.**  By continuing the Guidance in force, with all of its Constitutional and administrative defects, the DEA adhered to the Policy adopted under color of law, and failed to rescind a Guidance process so loaded with "poison pills" that any visionary church would decline to submit a petition, preferring to continue with the risks of practicing "underground," rather than submit a confession to the DEA in hopes of gaining an exemption.

**160.** The DEA is under the direct injunction of the Attorney General to "proactively consider the burdens on the exercise of religion and possible accommodation of those burdens [when] formulating rules, regulations, and policies."[60]  Nevertheless, the DEA has remained consciously indifferent to the Plaintiffs' First and Fourteenth Amendment rights of Free Exercise and due process, in denying visionary churches a path to regulatory services necessary to give substance to RFRA's promise of Free Exercise to visionary churches.

**161.** The DEA's publication of the Guidance, and its subsequent failure to withdraw it when faced with the unambiguous directives of Executive Order 13891 and the OMB Implementing Memo, demonstrate the DEA's commitment to pursuing the Policy, and

---

[60] *Memorandum on Federal Law Protections for Religious Liberty*, 82 Federal Register 49668, 4671.

the agency's conscious indifference to the Free Exercise rights of AYA, AYA's congregation, NAAVC, NAAVC's member churches, and their congregations.

162. AYA, its congregation, NAAVC and NAAVC's member churches and congregations have suffered injury to their Free Exercise rights due to the DEA's denial of regulatory services and ignorance of its duties to visionary churches seeking exemptions from the CSA.

163. In pursuit of the Policy, the DEA's Guidance has had a disparate impact on visionary churches, depriving them of  any access to a system for obtaining exemptions from those provisions of the CSA that substantially burden plaintiffs' religious Free Exercise.

164. The Government's adoption and implementation of the Policy, in conscious disregard of the rights of visionary churches, has injured AYA, AYA's congregation, NAAVC, and NAAVC's visionary church members, frustrating their sincere, lawful desire to engage in Free Exercise through sacramental use of Ayahuasca, to minister to congregants and the visionary church community.  Plaintiffs have been forced into a state of legal peril that causes persons who would otherwise join AYA or similarly-situated visionary churches, to avoid association with visionary churches for fear of prosecution, negative publicity, loss of employment, loss of standing in the community, loss of individual freedom, and imprisonment.

165. Sixty-nine percent of AYA congregants are hesitant to tell others about their positive experiences because of questions surrounding the legality of this form of Free Exercise. Fifty-three point nine percent are hesitant to tell family, close friends or associates about Ayahuasca for the same reason.

166. AYA suffers from the Policy's chilling effects, that prevent people who would join the congregation from doing so out of fear of the legal and reputational risks.  NAAVC suffers from a severe disadvantage in recruiting visionary churches into its association because of the fear that membership in NAAVC may expose them to enforcement scrutiny from the Government.

**167.** The DEA agency action and inaction due to the Policy and the Guidance, and the concerted denial of regulatory services to plaintiffs and other visionary churches, congregations, and visionary church associations, was arbitrary, capricious, an abuse of discretion, not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and, without observance of procedure required by law; wherefore, the actions should be held unlawful and set aside, and the DEA and DOJ compelled to take the action which has been unreasonably delayed, to wit, the implementation of a system of providing regulatory services to visionary churches that gives effect to their rights of Free Exercise, and does not impose substantial burdens under the guise of helpful procedure.

## VIII.   <u>THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS</u>
### <u>Declaratory Relief, 28 U.S.C. §§ 2201 – 2202</u>

**168.** An actual controversy exists between the plaintiffs and the Government.  AYA and NAAVC are interested parties to this controversy, and seek a declaration of their respective rights and relations with the Government, as further alleged hereinbelow.

**169.** Plaintiffs contend that:

      a.   The Government has a compelling interest in protecting the religious freedom of its people;

      b.   The *prima facie* sincerity of an Ayahuasca church may be established by a simple averment establishing sincere religious intent;

      c.   Ayahuasca is not subject to the risks of diversion applicable to other substances regulated by the CSA;

      d.   AYA is a religious person within the meaning of RFRA, endowed with the right of self-determination, sincerely professing a doctrine of visionary religion whose central practice is communion with Divine Love through drinking sacramental Ayahuasca in sacred ceremony;

e.  NAAVC is a religious person within the meaning of RFRA, endowed with the right of self-determination,  an association of visionary churches whose primary act of Free Exercise is ministering to the needs of visionary churches by serving as an importer of sacramental Ayahuasca for distribution to exempt visionary churches;

f.  AYA's rights of religious Free Exercise are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.

g.  NAAVC's rights of religious Free Exercise are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.

h.  The CSA's absolute prohibition on AYA's importation, distribution, and dispensing of Ayahuasca to its congregation is not the least restrictive means of preventing diversion of Ayahusca to the illicit market;

i.  The CSA's absolute prohibition on NAAVC's importation, distribution, and dispensing of Ayahuasca to its congregation is not the least restrictive means of preventing diversion of Ayahusca to the illicit market;

j.  AYA and NAAVC are entitled to exemptions from the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.

k.  AYA and NAAVC are entitled to receive DEA Numbers as exempt persons under 21 CFR 1312.11;

l.  The DEA, the Government's administrative agency, had and has an official policy of denying regulatory services to persons seeking exemption from

the CSA for purposes of Free Exercise, except where compelled by court order (the "Policy");

m. The DEA's Policy and its issuance of the Guidance thereunder was a reviewable agency action within the meaning of 5 U.S.C. § 702;

n. The Guidance established no administrative remedy exhaustion requirement;

o. The Guidance established a system for adjudicating the religious character of petitioners;

p. Under the Guidance, the petition adjudicator is anonymous, operates without legal guidelines or timelines for completing of the adjudication, and there is no swift method of appeal from an adverse decision;

q. The Guidance process and the Adjudicative Body have failed to approve any petitions for exemption in fourteen years;

r. The Guidance substantially burdens the Free Exercise of AYA and its congregation, and NAAVC and its member visionary churches;

s. The Guidance is directed at imposing legal detriment upon visionary churches particularly, and is not a neutral enactment, law or policy;

t. The Guidance is not the least restrictive means of advancing any compelling governmental interest;

u. The Guidance has been used under color of law as a pretext for propounding *de facto* administrative subpoenas backed by an implied threat of prosecution;

v. By falsely promising to provide a path to obtaining regulatory services from the DEA, the DEA obtained inculpating statements from persons who signed petitions that were submitted to the DEA in good faith;

w. The Guidance does not prevent the DEA from using inculpating statements in petitions to investigate and/or prosecute petitioners;

x.  The DEA has never acted on the petitions that it compelled the petitioners to submit;

y.  The DEA's use of the Guidance in furtherance of the Policy had and has a chilling effect upon AYA's rights of Free Exercise, upon NAAVC, and upon the community of visionary churches represented by NAAVC;

z.  The DEA's use of the Guidance as a vehicle for the Policy has accomplished the constitutionally impermissible goal of frustrating the sincere Free Exercise rights of AYA, AYA's congregation, NAAVC, and NAAVC's member churches and congregations;

aa. The Policy, the Guidance, and all other agency actions that have served to impede the Free Exercise of plaintiffs, were arbitrary, capricious, an abuse of discretion, not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and, without observance of procedure required by law;

bb. Pursuant to the executive authority of the Office of the President as set forth in EO 13891 and the OMB Implementing Memo, the Guidance was affirmatively withdrawn as the policy of the Government, and is unenforceable;

cc. The DEA's use of the Guidance as a ruse to present the appearance of a legitimate path for visionary churches to obtain regulatory services was an act of conscious indifference that caused compensable injury to the civil rights of plaintiffs; and

dd. The Guidance has no legal validity, and was adopted under color of law, pursuant to the Policy, to frustrate the legal rights of Free Exercise of plaintiffs, their members and other religious persons;

ee. If not enjoined, the DEA will continue to use the Guidance as a springboard for *de facto* stop orders and administrative subpoenas that chill Free Exercise and violate the Establishment Clause of the First Amendment by making administrative inquiries into church business that constitutes an entanglement with religion;

ff. The Ayahuasca seized by DHS was the lawful property of NAAVC and AYA, imported as an act of Free Exercise, and  not subject to seizure; and,

gg. The requested injunction will serve the public interest.

170. Defendants dispute the Plaintiffs' contentions.

171. Wherefore, there is an actual dispute between the parties that this Court is authorized to adjudicate, and to resolve by issuing a declaration stating the rights and relations of the parties.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in its favor and against defendant by the issuance of a decree providing as follows:

1. FINDINGS:

   a. The Government has a compelling interest in protecting the religious freedom of its people;

   b. The *prima facie* sincerity of an Ayahuasca church may be established by a simple averment establishing sincere religious intent;

   c. Ayahuasca is not subject to the risks of diversion applicable to other substances regulated by the CSA;

   d. AYA is a religious person within the meaning of RFRA, sincerely professing a doctrine of visionary religion whose central practice, as established by their right of self-determination,  is communion with Divine Love through drinking sacramental Ayahuasca in sacred ceremony;

e.  NAAVC is a religious person within the meaning of RFRA, as established by their right of self-determination,  an association of visionary churches whose primary act of Free Exercise is ministering to the needs of visionary churches by serving as an importer of sacramental Ayahuasca for distribution to exempt visionary churches;

f.  AYA's rights of religious Free Exercise are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.

g.  NAAVC's rights of religious Free Exercise are substantially burdened by the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.

h.  The CSA's absolute prohibition on AYA's importation, distribution, and dispensing of Ayahuasca to its congregation is not the least restrictive means of preventing diversion of Ayahusca to the illicit market;

i.  The CSA's absolute prohibition on NAAVC's importation, distribution, and dispensing of Ayahuasca to its congregation is not the least restrictive means of preventing diversion of Ayahusca to the illicit market;

j.  AYA and NAAVC are entitled to exemptions from the prohibitions on manufacturing, distributing, or dispensing a controlled substance in § 841(a) (2), and by the prohibition on importation in § 952(a) of the CSA.

k.  AYA and NAAVC are entitled to receive DEA Numbers as exempt persons under 21 CFR 1312.11.

l.  The DEA, the Government's administrative agency, had and has an official policy of denying regulatory services to persons seeking exemption from

the CSA for purposes of Free Exercise, except where compelled by court order (the "Policy");

m. The DEA's Policy and its issuance of the Guidance thereunder was a reviewable agency action within the meaning of 5 U.S.C. § 702;

n. The Guidance was not adopted pursuant to notice-and-comment rulemaking under the Administrative Procedure Act or published in the Federal Register;

o. The Guidance established no administrative remedy exhaustion requirement;

p. The Guidance established a system for adjudicating the religious character of petitioners;

q. Under the Guidance, the petition adjudicator is anonymous, operates without legal guidelines or timelines for completing of the adjudication, and there is no swift method of appeal from an adverse decision;

r. The Guidance process and the Adjudicative Body have failed to approve any petitions for exemption in fourteen years;

s. The Guidance substantially burdens the Free Exercise of AYA and its congregation, and NAAVC and its member visionary churches;

t. The Guidance is directed at imposing legal detriment upon visionary churches particularly, and is not a neutral enactment, law or policy;

u. The Guidance is not the least restrictive means of advancing any compelling governmental interest;

v. The Guidance has been used under color of law as a pretext for propounding *de facto* administrative subpoenas backed by an implied threat of prosecution;

w.  By falsely promising to provide a path to obtaining regulatory services from the DEA, the DEA obtained inculpating statements from persons who signed petitions that were submitted to the DEA in good faith;

x.  The Guidance does not prevent the DEA from using inculpating statements in petitions to investigate and/or prosecute petitioners;

y.  The DEA has never acted on the petitions that it compelled the petitioners to submit;

z.  The DEA's use of the Guidance in furtherance of the Policy had and has a chilling effect upon AYA's rights of Free Exercise, upon NAAVC, and upon the community of visionary churches represented by NAAVC;

aa. The DEA Policy, the Guidance, and all other agency actions that have served to impede the Free Exercise of plaintiffs, were arbitrary, capricious, an abuse of discretion, not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and, without observance of procedure required by law;

bb. The DEA's use of the Guidance as a vehicle for the Policy has accomplished the constitutionally impermissible goal of frustrating the sincere Free Exercise rights of AYA, AYA's congregation, NAAVC, and NAAVC's member churches and congregations;

cc. Pursuant to the executive authority of the Office of the President as set forth in EO 13891 and the OMB Implementing Memo, the Guidance was affirmatively withdrawn as the policy of the Government, and is unenforceable;

dd. The DEA's use of the Guidance as a ruse to present the appearance of a legitimate path for visionary churches to obtain regulatory services was an

act of conscious indifference that caused compensable injury to the civil rights of plaintiffs; and

ee. The Guidance has no legal validity, and was adopted under color of law, pursuant to the Policy, to frustrate the legal rights of Free Exercise of plaintiffs, their members and other religious persons;

ff. The Ayahuasca seized by DHS was the lawful property of NAAVC and AYA, imported as an act of Free Exercise, and  not subject to seizure; and,

gg. The injunction requested by Plaintiffs will serve the public interest.

WHEREFORE,

1. The Government and all named defendants, on behalf of their respective agencies, to wit, William Barr on behalf of the Department of Justice; Uttam Dhillon on behalf of the Drug Enforcement Administration; Chad F. Wolf on behalf of the Department of Homeland Security; and, Mark A. Morgan on behalf of Customs and Border Protection, are prohibited from:

a. Utilizing the Guidance as a source of law or procedure in any way, including but not limited to, issuing any *de facto* administrative subpoenas to AYA or NAAVC, or contending that the plaintiffs must adhere to the requirements of the Guidance;

b. Denying regulatory services to AYA or NAAVC;

c. Commencing investigations of AYA or NAAVC or their members based upon the matters disclosed in this action;

d. Imposing any system of prior restraints on the Free Exercise of religion by AYA, NAAVC, or their respective members;

e. Taking any enforcement action under the CSA against AYA for importing, manufacturing, or dispensing sacramental Ayahuasca to its congregants;

f.   Taking any enforcement action under the CSA against NAAVC for importing, manufacturing, or dispensing sacramental Ayahuasca to exempt visionary churches;

g.   Interfering with shipments of sacramental Ayahuasca to or from AYA to its congregants; and,

h.   Interfering with shipments of sacramental Ayahuasca from NAAVC to exempt visionary churches.

2.   Uttam Dhillon, on behalf of the DEA, is ordered to:

a.   Issue a valid DEA Number to AYA, and enter AYA upon the records of the DEA as an exempt registrant;

b.   Issue a valid DEA Number to NAAVC, and enter NAAVC upon the records of the DEA as an exempt registrant; and,

c.   Provide all other regulatory services to AYA and NAAVC as are necessary to allow their Free Exercise of religion by means of importing, manufacturing and dispensing Ayahuasca to exempt visionary churches.

3.   Chad F. Wolf, on behalf of DHS, is ordered to deliver the sacramental Ayahuasca seized from NAAVC and AYA to AYA.

PLAINTIFFS FURTHER PRAY:

1.   That defendant Thomas Prevoznik be held liable in damages to AYA and NAAVC, in an amount to be established by proof.

2.   That plaintiffs be awarded their attorneys fees pursuant to 42 U.S.C. § 1988(b).

3.   That Plaintiffs be awarded such other and further relief as the Court deems just.

Dated:  May 5, 2020                    CHARLES CARREON, ESQ.

By: /s/Charles Carreon
CHARLES CARREON (127139)
Attorney for Plaintiffs
Arizona Yagé Assembly and
North American Association of Visionary Churches

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial.

Dated:  May 5, 2020                    CHARLES CARREON, ESQ.

By: /s/Charles Carreon
CHARLES CARREON (127139)
Attorney for Plaintiffs
Arizona Yagé Assembly and
North American Association of Visionary Churches