1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

ARIZONA YAGE ASSEMBLY, et al.,

Plaintiffs,

8

9

v.

10

WILLIAM P. BARR, et al.,

Defendants.

11

12

13

14

Case No. 3:20-cv-03098-WHO

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS, DENYING DEFENDANTS' MOTION TO STAY, DENYING DEFENDANTS' MOTION TO STRIKE THE FIRST AMENDED AND SUPPLEMENTAL COMPLAINT, DENYING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTIONS**

Re: Dkt. Nos. 17, 19, 20, 22, 29, 31, 33, 34

15        Before me is an interrelated set of motions.  In a suit against various agencies and officers

16   of the federal government, the plaintiffs originally alleged that they use ayahuasca, which contains

17   the controlled substance DMT, as part of their sincere religious practice.  They asked for an

18   exemption from the federal Controlled Substances Act under the Religious Freedom Restoration

19   Act.  In a supplemental complaint—which added a plaintiff and added agencies and officers of the

20   State of Arizona and Maricopa County as defendants—plaintiffs further alleged that a law

21   enforcement investigation, search, and seizure carried out by the Maricopa County Sheriff's Office

22   was a pretextual attempt to interfere with this suit.  They request two preliminary injunctions:  one

23   would prohibit any of the defendants from carrying out their alleged retaliatory conspiracy or

24   criminally investigating the plaintiffs and the other would exempt one of the plaintiffs from the

25   Controlled Substances Act.

26        Each set of defendants has filed its own motions.  I deny the federal defendants' motions to

27   stay this case or strike the supplemental complaint; these issues may be litigated now.  But as a

28   threshold issue, it is unclear that these issues should be litigated in this court.  Plaintiffs have not

United States District Court
Northern District of California

1    pleaded or demonstrated that any of them reside in this District, which makes venue improper.  It

2    seems apparent that Arizona courts would have jurisdiction over these claims; perhaps a California

3    court, even this one, would have jurisdiction under a properly pleaded Second Amended

4    Complaint.  But the claims against the Arizona and Maricopa County defendants concern a

5    criminal investigation in Arizona and is properly considered there.  I will grant the motions to

6    dismiss the newly added Arizona-based defendants for lack of personal jurisdiction.

7         I also deny both of plaintiffs' motions for preliminary injunctions.  Given the jurisdictional

8    problem, plaintiffs are unlikely to prevail until that problem is overcome.  And then they will need

9    to allege facts sufficient to make the extraordinary relief sought in the preliminary injunctions

10   appropriate, particularly since plaintiffs have not alleged a pre-enforcement threat by the DEA.

11   All of these rulings are without prejudice to plaintiffs amending their complaint to assert

12   jurisdiction here or refiling the claims in another court with jurisdiction.

**BACKGROUND**

13

14   **I.      Factual Background**

15        Ayahuasca is a tea that contains dimethyltryptamine ("DMT").  First Amended and

16   Supplemental Complaint ("FASC") [Dkt. No. 12] ¶ 43.  DMT is a Schedule I controlled substance

17   under the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq*., ("CSA").  *Id.* § 812(c), Schedule I,

18   (c)(6).  As a general matter, the CSA regulates the use, importation, manufacture, possession, and

19   distribution of certain "psychotropic substances."  *See id.* § 801a(1).  These substances are

20   classified by "schedules"; Schedule I is for substances that have (1) "a high potential for abuse,"

21   (2) "no currently accepted medical use in treatment in the United States," and (3) "a lack of

22   accepted safety for use . . . under medical supervision."  *Id.* § 812(b)(1).  The CSA imposes a web

23   of criminal and civil penalties for various forms of use, possession, distribution, and manufacture

24   of controlled substances.  *See, e.g.*, *id.*§§ 841–44a.  It also grants the Attorney General authority to

25   "register" applicants to distribute Schedule I controlled substances lawfully "unless he determines

26   that the issuance of such registration is inconsistent with the public interest."  *Id.* § 823(b).  The

27   Attorney General has delegated this authority to the Drug Enforcement Administration ("DEA").

28   21 C.F.R. § 1301.31.

United States District Court
Northern District of California

1    Plaintiffs Arizona Yagé Assembly (AYA) and North American Association of Visionary

2    Churches (NAAVC) allege that they are "religious nonprofit corporations."  FASC ¶ 6.  Plaintiff

3    Clay Villanueva, a resident of Arizona, helped found NAAVC, sits on NAAVC's board of

4    directors, and is the founder of the Vine of Light church.  *Id.* ¶ 7; *see id.* ¶¶ 199–200 (describing

5    Villanueva's "residence" and "home" in Maricopa County); Villanueva Decl. [Dkt. No. 22-1] ¶ 17

6    (describing residence as his "home").  AYA and Vine of Light refer to themselves as "visionary

7    churches" and NAAVC is an association of visionary churches.  *Id.* ¶¶ 7, 47, 62.  According to the

8    plaintiffs, a visionary church is one whose members "practice visionary communion" by ingesting

9    ayahuasca to induce a religious or spiritual experience.  *Id.* ¶ 36.

10    AYA was established in 2015, incorporated in Arizona.  AYA Arizona Articles of

11    Incorporation [Dkt. No. 20-2].  In January 2019, AYA also incorporated under California law.

12    AYA California Articles of Incorporation [Dkt. No. 20-4].  It alleges that its members use

13    ayahuasca for sincere religious and spiritual purposes.  FASC ¶¶ 47–50.  Indeed, "[d]rinking

14    sacramental Ayahuasca is the central communion ceremony of AYA."  *Id.* ¶ 129.  The ayahuasca

15    causes psychotropic effects and, according to AYA, "generates a spiritually uplifting experience of

16    approximately four hours."  *Id.* ¶ 43.  AYA's members consume ayahuasca in "sacred

17    ceremon[ies]," *id.* ¶ 48, that create "[h]ealing power," *id.* ¶ 49.  AYA alleges that it and its

18    members will be exposed to penalties under the CSA for these practices.  *See id.* ¶¶ 58–59.

19    Because it is not exempted, it fears that its importation, possession, and distribution of ayahuasca

20    to its members will expose it to liability.  *Id.*  It claims that its members "censor their own speech

21    about their religious beliefs and practices" and may suffer stigma or penalties due to ayahuasca's

22    controlled status.  *Id.* ¶ 58.

23    NAAVC was established in July 2019, incorporated in California.  *Id.* ¶ 62; NAAVC

24    Articles of Incorporation [Dkt. No. 20-6].  It "funds and promotes the study of visionary religion."

25    FASC ¶ 62.  NAAVC's goal is to maintain a "lawful system for importing and sharing" ayahuasca

26    with visionary churches.  *Id.* ¶ 64.  Because it, like AYA, is not exempt from the CSA, it too fears

27    its activities will place it in violation of the law.  *See* ¶¶ 63–65.

28    The Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*,

United States District Court
Northern District of California

3

provides that the federal "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless "it demonstrates that the application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering" that interest. *Id.* § 2000bb-1(a)–(b). In 2006, the Supreme Court of the United States made clear that RFRA applies to the CSA and actions taken under it. *See generally Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). As a result of that decision and the ensuing increase in exemption requests on religious grounds, the DEA has created a system to consider granting religious exemptions under RFRA. In 2009, the DEA issued a guidance document (the "2009 Guidance") to serve as an "interim measure intended to provide guidance to parties who wish to petition for a religious exemption to the CSA." Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act, at https://www.deadiversion.usdoj.gov/GDP/(DEA-DC-5)%20Guidance%20Regarding%20Petitions%20for%20Religious%20Exemptions.pdf. The 2009 Guidance indicates how petitions for exemptions should be submitted, what they should contain, and the formalities required. *Id.* Applicants must demonstrate that "application of the [CSA] to the party's activity would (1) be a substantial burden on (2) his/her sincere (3) religious exercise." *Id.*

The plaintiffs allege that the DEA, in considering religious exemptions to the CSA, has an unwritten policy of "denying regulatory services to visionary churches and refusing all requested religious exemptions from the CSA." FASC ¶ 76. The DEA, they argue, has only ever approved similar exemptions under court order or express statutory direction. *Id.* ¶ 76, 85–88. The plaintiffs also claim that the existing process for granting or denying exemptions—mapped out in the 2009 Guidance—is a "pretext" to deter visionary churches from filing lawsuits to obtain exemptions. *Id.* at 29.

On May 19, 2020, fourteen days after the Original Complaint in this case was filed, Villanueva's house in Arizona was searched by a team from the Maricopa County Sheriff's Office ("MCSO"), led by MCSO detective Matthew Shay. *Id.* ¶ 199; Plaintiffs' Notice of Errata [Dkt.

No. 21] at 2.  Villanueva was detained and his church's ayahuasca was seized—along with marijuana, mobile phones, financial records, and other items.  FASC ¶¶ 199–200.  The plaintiffs allege that the unit that investigated Villanueva and carried out the search was operating under the High Intensity Drug Trafficking Areas ("HIDTA") program.  *Id.* ¶ 190.  HIDTA is a program created by Congress that provides funding and support from the federal government to state and local governments in areas identified as "significant center[s] of illegal drug production, manufacturing, importation, or distribution."  *See* High Intensity Drug Trafficking Areas, https://www.dea.gov/hidta.[1]  This operation, the plaintiffs claim, was actually orchestrated by the DEA—and included Arizona state law enforcement officials in varying capacities.  FASC ¶¶ 122, 184.  They allege that it was an unconstitutional retaliation for NAAVC filing this suit and, in January 2020, urging the DEA in a letter (the "January 2020 Letter") to rescind the 2009 Guidance.  *Id.*  ¶¶ 122, 184.  They represent that the letter was dated January 8, 2020.  *Id.* ¶ 121.  The plaintiffs also allege that MCSO, which has been found to have committed unconstitutional conduct in the past, had unconstitutional bias against Villanueva because of his Hispanic surname.  *Id.* ¶¶ 191, 201.

The defendants dispute this account.  The federal defendants represent—and support with sworn declarations—that the only involvement the federal government had in the operation was passing along a routine tip to MCSO about Villanueva's ayahuasca use on January 8, 2020.  *See* Dkt. No. 41 at 9; Paddy Decl. [Dkt. No. 41-1] at 2–3.  The DEA received an email from NAAVC's attorney that included the January 2020 Letter the next day, January 9, 2020.  Miller Decl. [Dkt. 41-2] at 3.  MCSO officer Shay states that the DEA gave him this tip and had no further involvement in the investigation.  *See* Shay Decl. [Dkt. No. 39-1] ¶¶ 8–16, 32–33.  He says that he had no knowledge of the January 2020 Letter, this lawsuit, or that Villanueva was connected to NAAVC.  *Id.* ¶¶ 11–12.  The search found marijuana, 91 pounds of ayahuasca paste, 15 bottles of ayahuasca liquid, 260.5 grams of "suspected" psilocybin mushrooms, and more than

---

[1] I take judicial notice of the HIDTA website because it is a government website providing a basic description of a government program that is not subject to reasonable dispute.  *See* Fed. R. Evid. 201(b)(2).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    $14,025.  *Id.* ¶ 38.

2    **II.    Procedural Background**

3          AYA and NAAVC filed their Original Complaint on May 5, 2020, against various

4    agencies of the federal government and federal officers acting in their official capacities

5    (collectively, the "federal defendants").[2]  Original Complaint ("Orig. Compl.") [Dkt. No. 1].  It

6    was also filed against Thomas Prevoznik, Deputy Assistant Administrator of the DEA's Diversion

7    Control Division, in his personal capacity, *id.*; the plaintiffs have since voluntarily dismissed him

8    from the suit.  Dkt. No. 37.  The Original Complaint alleged three claims.  First, the plaintiffs

9    argued that RFRA exempts their religious use of ayahuasca from the CSA's prohibitions on

10   possession, use, distribution, and importation.  *See* Orig. Compl. ¶¶ 123–147.  Second, the

11   Original Complaint claimed that DEA's process for administering religious exemptions to the

12   CSA was unlawful and should be set aside under the Administrative Procedure Act.  *See id.* ¶¶

13   148–167.  Specifically, the plaintiffs claimed that (1) DEA's alleged unwritten policy of denying

14   visionary churches CSA exemptions was unconstitutionally discriminatory in violation of the First

15   Amendment and due process principles and (2) the 2009 Guidance violated an executive order that

16   required agencies to rescind non-binding guidance documents or reaffirm them and publish them

17   in a central index.  *See id.*  Third, the plaintiffs requested declaratory relief premised on these

18   claims.  *See id.* ¶¶ 168–171.  They also requested extensive injunctive relief, damages against

19   Prevoznik, and attorney's fees.  *Id.* at 48–53.

20         On June 16, 2020, the plaintiffs filed what they styled a "First Amended and Supplemental

21   Complaint" ("FASC").  Dkt. No. 12.  The FASC added Villanueva as a plaintiff.  FASC at 1.  It

22   also added two sets of defendants: the State of Arizona and Arizona Attorney General Mark

23   Brnovich (collectively, the "Arizona defendants") and Maricopa County and Shay (collectively,

24   the "Maricopa defendants").  *Id.*  The FASC added two new claims.  First, NAAVC and

25   Villanueva claimed relief under 42 U.S.C. § 1983 ("Section 1983") for the alleged unlawful

26

27   _____

     [2] These defendants are United States Attorney General William P. Barr, Acting Administrator of
28   the U.S. Drug Enforcement Administration Uttam Dhillon, Acting Secretary of the Department of
     Homeland Security Chad F. Wolf, Acting Commissioner of U.S. Customs and Border Protection
     Mark A. Morgan, and the United States of America.

retaliation by the Arizona defendants, the Maricopa defendants, the DEA, and unnamed DEA agents purportedly involved in the operation. *Id.* ¶¶ 173–222. Second, Villanueva claimed that Arizona's "complete ban" of his use of ayahuasca under state law violated another state law, the Arizona Free Exercise of Religion Act, A.R.S. § 41-1493.01. *Id.* ¶¶ 223–233.

After the FASC was filed, all parties filed a series of overlapping motions. First, the federal defendants and Prevoznik—the federal officer sued in his personal capacity—each moved to stay these proceedings. Prevoznik Stay Motion [Dkt. No. 17]; Federal Defendant Stay Motion ("Stay Mot.") [Dkt. No. 19]. In the alternative, the federal defendants moved to enlarge the time to respond to the complaint. Stay Mot. 5. Prevoznik explained that the Supreme Court granted review in a case in which the question presented was whether RFRA "authorizes suits seeking money damages against individual federal employees." Prevoznik Stay Motion at 2 (quoting Petr. Br. in *Tanvir v. Tanzin*, 140 S. Ct. 550 (2019) (No. 19-71) at 1). Prevoznik argued that the case against him should be stayed pending resolution of that question because it would determine whether he could be held personally liable. *Id.* Less than a month later, the plaintiffs voluntarily dismissed Prevoznik. Dkt. No. 37. The federal defendants have requested a stay pending the Supreme Court's resolution of that case as well. Stay Mot. 2. The plaintiffs oppose that request.

The federal defendants later moved to strike the FASC. Federal Defendant Motion to Strike ("Strike Mot.") [Dkt. No. 31]. They argue that it is a supplemental pleading that adds facts that occurred after the Original Complaint was filed and, consequently, required leave of the Court to be filed. *Id.* at 6. The plaintiffs oppose this motion and filed their own motion that concedes "neglect" in not requesting and receiving leave of the Court to file the pleading but requests relief from that requirement. Plaintiffs' Motion for Relief ("Relief Mot.") [Dkt. No. 34] 3.

Both the Arizona defendants and the Maricopa defendants filed motions to dismiss. The Arizona defendants argue that (1) this Court lacks personal jurisdiction over them; (2) venue is improper in this district; (3) the plaintiffs' claims—except against the Arizona Attorney General for injunctive relief under Section 1983—are barred by sovereign immunity; and (4) the Arizona defendants, as a state and its official acting in their official capacities, could not be held liable under Section 1983. State of Arizona's Motion to Dismiss ("Arizona MTD") [Dkt. No. 29] at 3–

7.  In their opposition, the plaintiffs conceded that the State of Arizona should be dismissed from the action and that the state law claim against the Arizona Attorney General should be dismissed. Plaintiffs' Opposition to Arizona MTD ("Arizona MTD Oppo.") [Dkt. No. 44] at 2.  But the plaintiffs maintained that the Section 1983 claim against the Arizona Attorney General could proceed.  *Id*.  The Maricopa defendants argue that (1) the FASC was improperly filed because the plaintiffs did not give notice or obtain leave of the Court, (2) the Court lacks personal jurisdiction over them, and (3) venue is improper in this district.  Maricopa County and Matthew Shay's Motion to Dismiss ("Maricopa MTD") [Dkt. No. 20] at 2–13.  The plaintiffs oppose this motion.

The plaintiffs moved for two preliminary injunctions based on the FASC.  The first requests that the defendants be enjoined "from pursuing a conspiracy grounded in retaliatory animus."  Plaintiffs' First Motion for Preliminary Injunction ("First PI Mot.") [Dkt. No. 22] 2. Specifically, the plaintiffs seek to prohibit the defendants from criminally investigating the plaintiffs; sharing information about the plaintiffs with other law enforcement agencies; making use of the materials seized or observed during the search of Villanueva's house; retaining the seized property; "[p]erforming any acts intended to cause damage to the person, property, or Free Exercise of NAAVC, AYA, Villanueva, or [Winfield Scott] Stanley[, chair of the NAAVC board of directors and founder of AYA]"; and joining AYA's Facebook group to "surveil[]" it.  *Id.* at 23–24.  The second motion, by AYA, requests that the defendants be enjoined from enforcing the CSA's prohibitions on possession of ayahuasca against it.  Plaintiffs' Second Motion for Preliminary Injunction ("Second PI Mot.") [Dkt. No. 35-1] 1.[3]  The defendants oppose these motions.

I held a hearing on all pending motions on September 9, 2020.  Dkt. No. 56.

## LEGAL STANDARDS

### I.    Motion to Stay

"[T]he power to stay proceedings is incidental to the power inherent in every court to

---

[3] This second preliminary injunction motion was originally filed at Dkt. No. 33.  Its pages were out of order and it was refiled at Dkt. No. 35-1 in the corrected order.  *See* Dkt. No. 35.  I use page numbers from the corrected filing.

1    control the disposition of the causes on its docket with economy of time and effort for itself, for

2    counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  A district court must

3    exercise its sound discretion to weigh "the competing interests affected."  *Lockyer v. Mirant*

4    *Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (citing *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th

5    Cir. 1962).  "Among those competing interests are the possible damage which may result from the

6    granting of a stay, the hardship or inequity which a party may suffer in being required to go

7    forward, and the orderly course of justice measured in terms of the simplifying or complicating of

8    issues, proof, and questions of law which could be expected to result from a stay."  *Id.*

9    **II.     Motion to Strike**

10        Federal Rule of Civil Procedure ("FRCP") 12(f) allows the Court to "strike from a

11   pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

12   "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must

13   arise from litigating spurious issues by dispensing with those issues prior to trial."  *Whittlestone,*

14   *Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (citation and alteration omitted).

15   Motions to strike "are generally disfavored [by courts] because the motions may be used as

16   delaying tactics and because of the strong policy favoring resolution on the merits."  *Barnes v.*

17   *AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010)

18   (citation omitted).  Such motions should only be granted if "the matter has no logical connection

19   to the controversy at issue *and* may prejudice one or more of the parties to the suit."  *New York*

20   *City Employees' Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009).  "Where the

21   moving party cannot adequately demonstrate such prejudice, courts frequently deny motions to

22   strike even though the offending matter literally was within one or more of the categories set forth

23   in Rule 12(f)."  *Id.* (citation and quotation marks omitted).

24        In resolving a motion to strike, the pleadings must be viewed in the light most favorable to

25   the nonmoving party.  *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal.

26   2004).  "Ultimately, whether to grant a motion to strike lies within the sound discretion of the

27   district court."  *Cruz v. Bank of New York Mellon*, No. 12-CV-00846-LHK, 2012 WL 2838957, at

28   *2 (N.D. Cal. July 10, 2012) (citing *Whittlestone*, 618 F.3d at 973).

United States District Court
Northern District of California

**III.     Motions to Dismiss for Lack of Personal Jurisdiction**

Under FRCP Rule 12(b)(2), a defendant may move to dismiss for lack of personal

jurisdiction.  The plaintiff then bears the burden of demonstrating that jurisdiction exists.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  The plaintiff "need

only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v.

Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).  "Although the plaintiff cannot simply rest on the

bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as

true." *Schwarzenegger*, 374 F.3d at 800 (citations omitted).  "Conflicts between [the] parties over

statements contained in affidavits must be resolved in the plaintiff's favor." *Id.*  "Where, as here,

the defendant's motion is based on written materials rather than an evidentiary hearing, the

plaintiff need only make a prima facie showing of jurisdictional facts to withstand a motion to

dismiss." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011).  In such

cases, "we only inquire into whether [the plaintiff's] pleadings and affidavits make a prima facie

showing of personal jurisdiction." *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th

Cir. 1995).  Courts may not, however, "assume the truth of allegations in a pleading which are

contradicted by affidavit." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284 (9th

Cir. 1977).

"Where, as here, there is no applicable federal statute governing personal jurisdiction, the

law of the state in which the district court sits applies." *Core-Vent Corp. v. Novel Indus. AB*, 11

F.3d 1482, 1484 (9th Cir. 1993) (citation omitted).  "California's long-arm statute allows courts to

exercise personal jurisdiction over defendants to the extent permitted by the Due Process Clause of

the United States Constitution." *Id.*; Cal. Civ. Proc. Code § 410.10.  "Because California's long-

arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional

analyses under state law and federal due process are the same." *Schwarzenegger*, 374 F.3d at

800–01.

"There are two types of personal jurisdiction: general and specific." *Fields v. Sedgwick

Associated Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986).  "[G]eneral jurisdiction permits a

defendant to be haled into court in the forum state to answer for any of its activities anywhere in

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the world." *Schwarzenegger*, 374 F.3d at 801. It exists where a nonresident defendant's activities

2   within a state are "substantial" or "continuous and systematic." *Data Disc.*, 557 F.2d at 1287.

3   Such contracts must "be of the sort that approximate physical presence." *Bancroft & Masters, Inc.*

4   *v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

5        Specific jurisdiction arises when a defendant's specific contacts with the forum give rise to

6   the claim in question. *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414–16

7   (1984). "A court exercises specific jurisdiction where the cause of action arises out of or has a

8   substantial connection to the defendant's contacts with the forum." *Glencore Grain Rotterdam BV*

9   *v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002). The Ninth Circuit employs a

10  three-part test to determine whether there is specific jurisdiction over a defendant:

11  (1) the non-resident defendant must purposefully direct his activities or consummate some

12  transaction with the forum or resident thereof; or perform some act by which he purposefully

13  avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits

14  and protections of its laws; (2) the claim must be one which arises out of or relates to the

15  defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair

16  play and substantial justice, i.e., it must be reasonable. *Schwarzennegger*, 374 F.3d at 802.

17       The first prong of that test may be satisfied by "purposeful availment of the privilege of

18  doing business in the forum; by purposeful direction of activities at the forum; or by some

19  combination thereof." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d

20  1199, 1206 (9th Cir. 2006) (citation and internal quotation marks omitted). In tort cases, courts

21  typically inquire whether a defendant "purposefully directs his activities at the forum state,

22  applying an 'effects' test that focuses on the forum in which the defendant's actions were felt,

23  whether or not the actions themselves occurred within the forum." *Id.* (citation and internal

24  quotation marks omitted).

25       With regard to the second prong, courts "measure this requirement in terms of 'but for'

26  causation." *Bancroft & Masters*, 223 F.3d at 1088. The plaintiff bears the burden of satisfying the

27  first two prongs of the test. *Schwarzenegger*, 374 F.3d at 802.

28       "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to

United States District Court
Northern District of California

the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable." *Id.* If the plaintiff cannot satisfy either of the first two prongs, personal jurisdiction is not established in the forum state. *Id.*

## IV.   Motions for Preliminary Injunctions

FRCP 65 governs preliminary injunctions. A preliminary injunction may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## DISCUSSION

## I.   Federal Defendants' Motion to Stay

I DENY the federal defendants' motion to stay proceedings. The federal defendants previously argued that this case should be stayed until the Supreme Court issues its decision in *Tanvir*. *See, e.g.*, Stay Mot. 8. They contended that a stay is appropriate because it would avoid "inefficient and duplicative piecemeal litigation" of the claims against the federal defendants and against Prevoznik in his personal capacity and would avoid inequity and hardship to Prevoznik. *Id.* at 10–12. But Prevoznik has now been voluntarily dismissed from the case. Dkt. No. 37. As a result, those risks are no longer present.[4]

The federal defendants' only remaining argument for a stay is that the government is currently at work on regulations that would supersede the 2009 Guidance and govern the process by which religious exemptions to CSA are granted. *See* Stay Mot. 8–10. The rulemaking "aims to implement a regulatory regime governing the agency's evaluation of applications for religious

---

[4] I DENY as moot Prevoznik's motion to stay because he has been dismissed from this action.

exemptions under RFRA." *Id.* at 9.  The federal defendants argue that the plaintiffs' claims will be mooted or at least significantly affected by replacing the 2009 Guidance.  *Id.*

While parallel or related administrative proceedings may sometimes be grounds to grant a stay, *see, e.g.*, *Nat'l Wildlife Fed'n v. EPA*, 925 F.2d 470, 473 (D.C. Cir. 1991), the existence of this drafting process is not sufficient.  As I explain, the timeframe is too indeterminate to grant a stay and there is no guarantee that the plaintiffs' claims would be affected, let alone mooted, by the existence of new regulations.

First, it is impossible to predict when the regulations will be finalized.  "Generally, stays should not be indefinite in nature."  *Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007).  Stays, in fact, "should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time."  *Id.* (internal quotation marks and citation omitted).  Here, DEA has not finished the first stage of drafting and has not indicated a date it reasonably expects to.  *See* Stay Mot. 8.  Once the initial drafting is complete, the regulations must still go through review within the U.S. Department of Justice and in the Office of Management and Budget.  *See id.* at 4.  Even assuming there are no disagreements that require a process of regulatory resolution, *see* Exec. Order No. 12,866, 58 Fed. Reg. 51735, Sec. 7 (Oct. 4, 1993), the draft regulations will still be submitted for public comment, those comments will be reviewed and considered, and DEA will draft final regulations.  *See* Stay Mot. 8; *see also* 5 U.S.C. § 553(c).  At the September 9 hearing, the federal defendants' counsel reiterated that he could not provide an estimate of when the regulations would be drafted.

To remedy the fact that the finalization date is unknown, the federal defendants argue that the stay could be terminated when the Supreme Court handed down its decision in *Tanvir*.  Stay Mot. 9.  But the *Tanvir* deadline was premised on Prevoznik's involvement in the case.  The reason it may have made sense to stay proceedings pending the Court's decision is that Prevoznik's liability might have turned on that decision.  Because Prevoznik has been dismissed from the case, the date that *Tanvir* is decided has no more significance than any other date—and it is no more related to this regulatory drafting process than any other.

Further, it is far from clear that the new regulations would affect, let alone moot, the

plaintiffs' claims. The Ninth Circuit has "decline[d] . . . to read an exhaustion requirement into RFRA where the statute contains no such condition . . . and the Supreme Court has not imposed one." *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012). That decision—which was handed down after the 2009 Guidance was in effect—noted that the Supreme Court "has reviewed a RFRA-based challenge to the CSA without requiring that the plaintiffs first seeks a religious use exemption from the DEA." *Id.* Consequently, it is possible that regardless of any new regulations, the plaintiffs will not have to seek an exemption from the DEA prior to seeking judicial redress. Those new regulations might also still be, in the plaintiffs' view, inadequate to what RFRA requires—and they would still ask a court for relief from the CSA. And, even if the new regulations did moot all of the plaintiffs' claims at an unspecified point in the future, the basic problem remains: there is an indeterminate stretch of time during which plaintiffs' claims would not be moot.

The federal defendants will also not suffer harm or inequity sufficient to justify a stay. They suggest several such harms: judicial inefficiency and "prejudging" the regulatory process. *See* Stay Mot. 10. First, any inefficiency is greatly diminished by the indeterminacy of the stay period. If the regulations were on the cusp of finalization, it may or may not be efficient to continue litigation. But it is possible that this case is resolved—one way or the other—before the regulations are issued. It is, either way, impossible to predict with certainty. Moreover, if the new regulations do not affect the plaintiffs' RFRA claims because there is no exhaustion requirement, there is nothing inefficient about resolving those claims now. Second, the federal defendants' claim that the regulatory process will "risk prejudging the regulatory options available to the DEA" is not a sufficient harm. *Id.* If the plaintiffs' claims are ultimately meritless, resolution of this litigation will not affect the rulemaking. And if the plaintiffs' claims are ultimately correct, DEA will have the guidance of an additional judicial ruling indicating what is and is not required by RFRA—a statute DEA would have to adhere to in any event.

The motion to stay the proceedings is DENIED.

## II. Defendants' Motion to Strike

As the plaintiffs admit, they improperly filed the FASC without giving notice or requesting

14

leave of this Court.  Relief Mot. 1.  They should have complied with the rule.  The fact that the mistake resulted from their counsel's failure to read Rule 15(d) does not excuse the failure to comply.  *See Harvest v. Castro*, 531 F.3d 737, 746 (9th Cir. 2008) ("Inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect.") (internal citations, quotations, and alterations omitted).  In the future, the plaintiffs' counsel must ensure he is familiar with all applicable rules.

I will nonetheless DENY the motion to strike and permit the FASC to be treated as the operative complaint in this case.  The issue has been briefed to the same extent as if Rule 15(d) had been complied with and, in light of my resolution of other motions, no defendant will be prejudiced.  Striking the FASC, on the other hand, would simply kick the can down the road—a result that is inefficient for the parties and the Court.

When a new complaint contains new facts that occurred after the filing of the original complaint, that new complaint is a supplemental pleading.  *See* FED. R. CIV. P. 15(d).  Supplemental pleadings may only be made "[o]n motion and reasonable notice" and are within the court's sound discretion to permit "on just terms."  FED. R. CIV. P. 15(d).  Leave to supplement is "favored" and supplemental pleadings "ought to be allowed as of course, unless some particular reason for disallowing them appears."  *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988) (internal quotation marks and citation omitted).  Supplemental pleadings cannot be used to "introduce a separate, distinct and new cause of action" that "should have been the subject of a separate suit."  *Planned Parenthood of S. Arizona v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997).

Here, the federal defendants have a solid argument that the two new claims added in the FASC are not sufficiently related to those in the Original Complaint.  I must, however, view the pleadings in the light most favorable to plaintiffs.  Taking the claims as the plaintiffs pleaded them, they are adequately related.  The Section 1983 claim is premised on the theory that the May 19 search was retaliatory for this suit.  The Arizona state law claim challenges a statute related to that search.  If the plaintiffs had properly requested leave to supplement under Rule 15(d), I would have granted it.

The federal defendants have not demonstrated sufficient prejudice to overcome the

presumptions that supplemental pleadings should be permitted and motions to strike denied.  The

FASC adds only a single claim against any of the federal defendants: the Section 1983 claim

against the DEA and its agents.  The federal defendants argue that they will face prejudice from

the addition of this claim, but it is unclear how.  First, they contend that they should be afforded

the opportunity to argue against permitting the FASC in the proper procedural posture.  Whether

or not to permit the FASC, however, has been thoroughly ventilated.  The arguments that the

federal defendants were able to make in their Motion to Strike and Reply do not differ from the

arguments they could make against filing the FASC in the first place.  Next, the federal defendants

argue they would be subject to two preliminary injunctions based on the FASC.  To start, the

federal defendants have had a full opportunity to respond to the preliminary injunction motions

and I deny those motions today.  Additionally, the second of those motions—requesting relief

under RFRA—could have been brought under the Original Complaint.  The first motion is

premised on the plaintiffs' Section 1983 claim and is, therefore, unlikely to survive a motion to

dismiss.  As my order on the Arizona and Maricopa defendants' motions to dismiss makes clear,

that claim is based entirely on unsupported speculation.  This reality, too, ensures that the Section

1983 claim would not "needlessly complicate," Strike Mot. 9, the case.

The Arizona and Maricopa defendants will not be prejudiced because I grant their motions

to dismiss.

Not striking the FASC also conserves the parties' and Court's resources.  The reasons to

allow or not allow the FASC have been thoroughly briefed across multiple sets of motions.  There

is nothing that would be added by relitigating these same issues at a later date under a different

name.  I therefore DENY the defendants' motion to strike the FASC.[5]

### III.  The Arizona and Maricopa Defendants' Motions to Dismiss

The plaintiffs concede that the State of Arizona should be dismissed from this action.

Arizona MTD Oppo. 2.  The plaintiffs also concede that the Arizona state law claim (their Fourth

---

[5] My denial of the motion to strike gives plaintiffs the result they seek in their motion for relief
from the filing requirement.  Dkt. No. 34.  As a formality, I DENY that motion for relief:  Even
assuming FRCP 60(b)(1) and 6(b) apply in this context, counsel's neglect was not "excusable."
*See Harvest*, 531 F.3d at 746.

United States District Court
Northern District of California

Claim for Relief) against the Arizona Attorney General should be dismissed.  *Id.*  Consequently, the only claims remaining against the Arizona Attorney General or Maricopa defendants are the Section 1983 claim and the portion of the claim for declaratory relief premised on it.  The Arizona Attorney General and Maricopa defendants make a number of arguments for why those claims should be dismissed.  They first argue that this Court lacks personal jurisdiction over them.  I agree and so dismiss them from the suit.

### a.  General Jurisdiction

This Court lacks general jurisdiction over the Arizona Attorney General or the Maricopa defendants.  The plaintiffs have produced no evidence that any of those defendants' contacts with California are so "substantial" or "continuous and systematic"  *Data Disc.*, 557 F.2d at 1287, as to "approximate physical presence,"  *Bancroft & Masters*, 223 F.3d at 1086.  The plaintiffs' only argument that suggests there is general jurisdiction is that Arizona and California have extensive "cross-border legal and economic relations," including "law enforcement collaboration . . . established by a series of Interstate Compacts."  Arizona MTD Oppo. 9; Maricopa MTD Oppo. 9. The compacts standardize such activities as law enforcement reporting and transfer of those in custody between states.  *See* Arizona MTD Oppo. 9–10.  But the general existence of state collaboration and compacts does not render another state's attorney general, county, and county detective are "essentially at home,"  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011), in California.  Plaintiffs have pointed to no authority that indicates otherwise. Indeed, the entire purpose of compacts such as these is that the law enforcement officers of each state do *not* have connection approximating physical presence with other states; they rely on the law enforcement officers of those other states to carry out acts within their own jurisdictions.[6]

### b.  Specific Jurisdiction

The plaintiffs' primary argument for asserting jurisdiction is that specific jurisdiction exists

---

[6] The plaintiffs suggest that the relations between the two states shows that these defendants have "purposefully availed" themselves of California.  Maricopa MTD Oppo. 9.  But purposeful availment does not create general jurisdiction.  And these relationships cannot support specific jurisdiction because the cause of action here does not "arise[] out of or ha[ve] a substantial connection to" them. *Glencore*, 284 F.3d at 1123.

United States District Court
Northern District of California

over these three defendants.  I disagree.  The plaintiffs have not adequately shown that these

defendants have the necessary minimum contacts with California because there is no evidence

they "purposefully directed" any of their activities that give rise to the claims here at California.

*Schwarzennegger*, 374 F.3d at 802.  The only activity with any alleged link to this controversy—

and therefore the only activity that could meet the second prong of the Ninth Circuit's test, *see*

*id.*— is the law enforcement investigation that the plaintiffs allege was intended to, among other

things, alter the outcome of this proceeding.  That investigation and the May 19 search were not,

however, "purposefully directed" at California, and the effects were not felt here.  *See id.*  The

investigation was of an Arizona resident by Arizona officers.  The search was of that Arizona

resident's Arizona property by those Arizona officers.  The effects from that operation,

unsurprisingly, were entirely felt in Arizona.

The plaintiffs resist this conclusion by arguing that the investigation and search of

Villanueva's residence—led by Shay, carried out by the MCSO, and purportedly advised and

supported by the Arizona Attorney General's Office—was an attempt to influence this proceeding.

*See, e.g.*, Arizona MTD Oppo. 11.[7]  That investigation, they argue, was an effort to "terrify," *id.* at

15, Villanueva with intent to influence his testimony in this case.  *See id.* at 3. Because the

Arizona and Maricopa defendants were not parties to this case at the time of the investigation or

May 19 search, the core of the plaintiffs' theory is that DEA conspired with the MCSO—and

potentially even "commandeered" it—to carry out the pretextual, retaliatory investigation.  *See id.*

at 11.

But the plaintiffs have not pleaded any facts that, if accepted as true, would indicate that

DEA was meaningfully involved with the investigation or that there was any intent from anyone

involved to interfere with this case.  Instead, they have offered only speculation and conjecture—

bare allegations that are directly contradicted by the sworn declarations the defendants have

submitted.  While "*uncontroverted* allegations in the complaint must be taken as true,"

*Schwarzenegger*, 374 F.3d at 800 (emphasis added), courts "may not assume the truth of

---

[7] To the extent the plaintiffs argue that the investigation was in retaliation for the January 2020
Letter, it was not "purposefully directed" at California.

United States District Court
Northern District of California

allegations in a pleading which are contradicted by affidavit." *Data Disc*, 557 F.2d at 1284.

Shay—who led the investigation from inception to the May 19 search—avers that the

investigation began when the DEA passed along a tip on January 8, 2020 and that "[a]fter [that]

single phone conversation" Shay "did not communicate further" with the DEA agent who passed

the tip "regarding [it] or the investigation." Shay Decl. ¶ 14.  He states that he "did not ever

communicate with anyone regarding the circumstances of the NAAVC [January 2020 Letter] or

[this] lawsuit" and, in fact, that that both "were unknown to [him] until the filing of the [FASC]

naming [him] as a defendant." *Id.*  Further, the DEA agent did not tell him, and Shay did not

otherwise know, that Villanueva was connected to NAAVC. *Id.* ¶ 11.  Shay represents that he

"conducted an investigation that same way [he] would with any other tip that [he] deem[s]

credible." *Id.* ¶ 18.  As a result, the sworn evidence indicates that the investigation was

unconnected to this lawsuit and, accordingly, to California.

The plaintiffs attempt to contradict the sworn evidence with still more bare allegations.  As

I explain, none of the plaintiffs' unsupported allegations create an actual conflict with the

defendants' sworn representations.  *See Data Disc*, 557 F.2d at 1284; *see also Taylor v. Portland

Paramount Corp.*, 383 F.2d 634, 639 (9th Cir. 1967) ("We do not think that the mere allegations

of the complaint, when contradicted by affidavits, are enough to confer personal jurisdiction of a

nonresident defendant.  In such a case, facts, not mere allegations, must be the touchstone.  For

example, if an accident occurred in California, we doubt that an Oregon plaintiff, merely by

alleging that it occurred in Oregon, could give Oregon jurisdiction of a California defendant, in

face of a showing that the accident in fact occurred in California.")

First, the plaintiffs allege that "Shay admitted that probable cause to believe a crime had

been committed at the Vine of Light church by Villanueva had been lacking all along, and the

search had been a pretext for another purpose altogether—chilling Villanueva's Free Exercise,

Free Expression, and the Right to Petition this Court for redress of grievances."  FASC ¶ 205.  But

the evidence this alleged admission is premised on is simply that Shay told Villanueva "he did not

know whether charges would be filed against him." *Id.*  Shay's statement that he did not know

whether charges would be filed is in no way an admission that the investigation was pretextual.

As Shay states, any charging decision would be left to a prosecutor.  Shay Decl. ¶ 46.

Second, the plaintiffs argue that "Shay admitted he was directed to do the search in February 2020."  First PI Mot. 17.  The passage of Villanueva's Declaration they rely on for that statement, however, says no such thing.  All it says is that Shay stated the matter had first "come across his desk" in February.  Villanueva Decl. [Dkt. No. 22-1] ¶ 29.[8]

Third, the plaintiffs claim, based on the declaration of their attorney, that Shay "would have no investigative interest in a small Ayahuasca church," Arizona MTD Oppo. 11; Maricopa MTD Oppo. 11, unless the DEA improperly intervened and that MCSO had never before "had any interest in policing Ayahuasca churches."  Carreon Decl. [Dkt. No. 43-1] ¶ 8.  Again, those speculative allegations are overcome by sworn representations:  Shay explained how he received the tip and that he carried out the investigation as he would any other.  Shay Decl. ¶ 8, 18.[9]

Fourth, the fact that the initial tip came from the DEA is not sufficient to create a factual dispute that the investigation was aimed at interfering with this lawsuit.  Shay avers that the DEA forwarding tips to local law enforcement is "not unusual."  *Id.* ¶ 9.  This is especially so because, according to Shay and uncontradicted by the plaintiffs, "DEA agents do not generally investigate DMT possession, manufacturing, or distribution."  *Id.*  Shay further states that the agent who forwarded the tip did not tell him—and he did not know—that Villanueva was connected to NAAVC.  *Id.* ¶ 11.  In direct contradiction to the plaintiffs' allegations, Shay states that "[t]o the extent that there was any understand between myself and [the DEA agent] concerning the substance of his call and the tip, that understanding was that I would evaluate the tip and investigate appropriately."  *Id.* ¶ 13.  Finally, as noted, Shay did not communicate further with the

---

[8] The plaintiffs request that I take judicial notice of the Villanueva and Carreon Declarations submitted in support of their first preliminary injunction motion.  *See* Arizona MTD Oppo. 6; Maricopa MTD Oppo. 6.  It is proper to submit declarations to support or oppose jurisdiction.  *See Data Disc*, 557 F.2d at 1284.  To the extent the plaintiffs ask me to take judicial notice of the *truth* of the allegations contained in those declarations, I will not.  I will, however, consider the declarations in determining the existence of personal jurisdiction.

[9] The Maricopa defendants ask me to strike or disregard large portions of Carreon's Declaration because they do not "contain only facts," fail to "avoid conclusions and argument," and do not specify the basis of many statements in violation of FRCP 56.  *See* Maricopa MTD Reply [Dkt. No. 47] at 6–7. At present, because I grant the motions to dismiss, there is no need to strike the Declaration itself.

United States District Court
Northern District of California

agent about the investigation.  *Id.* ¶ 14

Fifth, the fact that the MCSO unit that carried out the search is part of the HIDTA program does not evidence any undue influence by the DEA on the MCSO investigation.  Once again, Shay's Declaration makes clear that DEA was not involved in the investigation beyond the initial tip.  *See id.*; *see also id. generally* (detailing steps taken to investigate).

Sixth and finally, the plaintiffs claim that the search was illegal and the warrant for it was obtained in bad faith.  Maricopa MTD Oppo. 15–16.  Even if the warrant were defective or the search unlawful, though, it would not help plaintiffs establish that the intention was to interfere with this proceeding.  The basic flaw of the plaintiffs' theory remains: there is sworn evidence that the search had nothing to do with this case.[10]

In terms of caselaw, the plaintiffs rely almost exclusively on *Boyd v. Arizona*, 469 Fed. Appx. 92 (3d Cir. 2012).  *See* Arizona MTD Oppo. 16; Maricopa MTD Oppo. 15.  In *Boyd*, the plaintiff resided in New Jersey and was prosecuted in Arizona for a crime he did not commit.  *See id.* at 94.  He sued, among others, an MCSO detective whom he alleged had caused the prosecution in retaliation for lawsuits he filed in New Jersey.  *Id.*  The Third Circuit held that the New Jersey district court had personal jurisdiction over that defendant because the plaintiff alleged the defendant (1) wrote his police report based on information received from New Jersey prosecutors, (2) put together a photo array used by the victim of a New Jersey crime, (3) traveled to New Jersey to collect the plaintiff's DNA, (4) testified before the Arizona grand jury that indicted the plaintiff, (5) prepared an affidavit in support of the plaintiff's extradition from New Jersey, and (6) entered into a "conspiratorial agreement" to provide the New Jersey extradition court with false and misleading information.  *Boyd*, 469 Fed. Appx. At 99.  The plaintiffs here do not allege that the Maricopa defendants and Arizona Attorney General had any of the most significant contacts with California that the *Boyd* defendant had with New Jersey.  There was no alleged gathering of information from California parties, no alleged travel to California, and no

---

[10] The plaintiffs further claim the investigation was unconstitutionally discriminatory based on Villanueva's "Hispanic surname."  FASC ¶ 201; Arizona MTD Oppo at 14.  Whether that is true or not does not alter whether the investigation was an attempt to interfere with this suit.

United States District Court
Northern District of California

attempt to bring anyone from California to Arizona.  Just as importantly, the Third Circuit gave no indication it was testing these allegations against sworn statements to the contrary.

At bottom, the plaintiffs repeatedly insist that, at this stage, the Court must assume the truth of their jurisdictional allegations.  That is not true when, as here, those bare allegations are contradicted by sworn, specific declarations based on personal knowledge.  Because the plaintiffs' responses are only further unsupported, speculative allegations, they have not met their burden to show that the Arizona Attorney General or Maricopa defendants' claim-related contacts with California establish specific jurisdiction.

### c.  Jurisdictional Discovery

In the alternative to finding personal jurisdiction, the plaintiffs request jurisdictional discovery.  *See* Arizona MTD Oppo. 6–7, 17–18; Maricopa MTD Oppo. 17.  District courts have "broad discretion to permit or deny discovery."  *Butcher's Union Local No. 498 v. SDC Inv., Inc*., 788 F.2d 535, 540 (9th Cir. 1986).  [D]iscovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."  *Id.*  But "where a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denial made by the defendants, the Court need not permit even limited discovery."  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006) (internal quotation marks and citation omitted).  That is precisely the situation here.  The plaintiffs argued for personal jurisdiction over the Arizona Attorney General and Maricopa defendants based on "bare allegations" in "the face of specific denials." Moreover, the plaintiffs' discovery request is brief and conclusory; it does not reveal any reason it is in the interests of justice to permit discovery.  Discovery with respect to these defendants based on speculation would be nothing more than a fishing expedition.

### d.  Conclusion

Because the plaintiffs concede the State of Arizona should be dismissed from this action and the Fourth Claim For Relief against the Arizona Attorney General should be dismissed, I GRANT those portions of the Arizona defendants' motion to dismiss.  I also GRANT the Maricopa defendants' and remaining portions of the Arizona defendants' motion to dismiss for

lack of personal jurisdiction.  I DENY the plaintiffs' motion for jurisdictional discovery.

## IV.  Plaintiffs' Motions for Preliminary Injunctions

The plaintiffs' first motion for a preliminary injunction requests a sweeping injunction against all defendants.  *See* First PI Mot. 2–3.  The Arizona and Maricopa defendants have now been dismissed from the action.  That preliminary injunction would, accordingly, issue only against the federal defendants.  The second motion for a preliminary injunction requests that AYA be given an exemption from the CSA under RFRA and is against the DEA and U.S. Customs and Border Patrol.  *See* Second PI Mot. 2.

Normally, each motion would be analyzed separately—and I have serious concerns about the plaintiffs' ability to demonstrate a likelihood of success on the merits for either motion.  The first injunction might run afoul of *Younger v. Harris*, 401 U.S. 37 (1971), because it arises out of a state criminal proceeding.  The plaintiffs may lack Article III standing because there is no remedy I could order *against the federal defendants* that would redress the alleged injuries.  As I indicated in ruling on personal jurisdiction over the Arizona and Maricopa defendants, the plaintiffs' allegation that there is a federal-state conspiracy is at present baseless and speculative, so the Section 1983 claim might not survive a Rule 12(b)(6) motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  And, the plaintiffs have likely not demonstrated the one narrow circumstance in which federal officers can be subject to Section 1983 liability, when their behavior is so closely tied to state officials' that it can be treated as the behavior of the state itself.  *See Cabrera v. Martin*, 973 F.2d 735, 744 (9th Cir. 1992).  As to the second motion, the plaintiffs have not shown, as they must to obtain a pre-enforcement injunction, that there has been any realistic, imminent threat of prosecution or enforcement action by the federal government.  They, therefore, have likely not demonstrated that they can succeed on the merits or would suffer irreparable injury absent an injunction.

At this stage, however, both motions fail for another, more preliminary reason.  The plaintiffs have not demonstrated a likelihood of success on the merits—or even serious questions going to the merits—because they have not pleaded or shown that venue is proper in this District.  I therefore DENY both motions for preliminary injunctions.  Plaintiffs may amend the complaint

if they believe they can demonstrate that venue here is proper.

### a. Venue Generally

28 U.S.C. § 1391(e) governs venue in "civil action[s] in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States." In those circumstances, venue is proper (absent an exception) "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). If venue is challenged, the plaintiff bears the burden of proving it is proper. *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). "[T]he clear weight of federal authority holds that venue is proper in a multi-plaintiff case if *any* plaintiff resides in the District." *Californians for Renewable Energy v. EPA*, No. 15-3292-SBA, 2018 WL 1586211, at *5 (N.D. Cal. Mar. 30, 2018) (surveying court of appeals and Ninth Circuit district court decisions).

For purposes of the federal venue statute, a natural person "shall be deemed to reside in the judicial district in which that person is domiciled." *Id.* § 1391(c)(1). An entity "shall be deemed to reside, . . . if a plaintiff, only in the judicial district in which it maintains its principal place of business." *Id.* § 1391(c)(2). And an entity's principal place of business is determined by the location of its "nerve center," the place "where the corporation's high level officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010).

The plaintiffs pleaded that venue was proper under the third category of Section 1391(e)(1) "because Plaintiffs are California corporations domiciled in California, their state of incorporation, and no real property is involved in this action." FASC ¶ 3. That pleading is inadequate to establish venue. Under the statute, as the federal defendants correctly argue, the plaintiffs were required to plead that they reside in this District. The plaintiffs make two arguments against this conclusion. First, they argue the federal defendants have waived the ability to object to venue. Second, they argue that venue is, in any event, proper in this District.

24

**b.  Waiver**

The plaintiffs contend that the federal defendants' objection to venue has been waived because it was "not raised at the first opportunity," namely the motion to stay.  First PI Reply [Dkt. No. 52] at 9.  The plaintiffs are incorrect.  An objection to venue may be made in a responsive pleading—here, the federal defendants' answer—or it may be made in a motion under Rule 12 prior to filing an answer.  *See* FED. R. CIV. P. 12(b), (g).  If venue is not objected to in those filings, it is waived.  *See* FED. R. CIV. P. 12(g), (h)(1).  A motion to stay, however, is not one of the motions contemplated by Rule 12, so it cannot waive an objection to venue.  *See* FED. R. CIV. P. 12(b), (c), (e), (f).[11]

After the federal defendants moved to stay proceedings but before they filed anything else, the plaintiffs moved for their first a preliminary injunction.  It was proper for the federal defendants to object to venue as a basis for opposing that motion—and the second preliminary injunction motion—because they have not yet filed or failed to file an answer, which would waive their ability.

**c.  Proper Venue**

Second, the plaintiffs argue that, regardless of waiver, venue is proper in this District.  But even in their replies regarding both preliminary injunction motions and their oppositions to motions to dismiss—which all defend against venue objections—the plaintiffs continue to allege only generalized connections to California, not, as the statute requires, that a plaintiff resides in this District.

**i.      AYA and NAAVC's Residence**

AYA and NAAVC are both entities and, therefore, each resides where it maintains its principal place of business.  28 U.S.C. § 1391(c)(2).  The FASC and all of the plaintiffs' filings— including no fewer than four responding directly to the issue of venue—conspicuously fail to allege where either AYA or NAAVC maintains its principal place of business.  They do not plead, as they must, that either principal place of business is in this District.

---

[11] The federal defendants expressly requested that the stay not prevent them from asserting defenses under FRCP 12(b), including venue.  Stay Mot. 1 n.2.

1    Instead, the plaintiffs attempt to demonstrate a number of other linkages with California.

2    The allegation that comes closest to establishing residency is that NAAVC maintains its "only

3    place of business in California."  First PI Reply 9–10; *see also* Maricopa MTD Oppo. 18.  To start,

4    the plaintiffs were required to plead that the principal place of business is in this District, not

5    California.  That pleading failure would be sufficient for the plaintiffs to have not met their

6    burden.

7    I nonetheless recognize that evidence provided by other parties in the case indicates that

8    NAAVC lists its business address in California as being in San Francisco—in this District.

9    NAAVC Articles of Incorporation [Dkt. No. 20-6].  As a result, the argument might be—though it

10   is not an argument the plaintiffs make—that NAAVC's "only" place of business is its principal

11   place of business.  The problem is that the location of a corporation's principal place of business is

12   not tied to any physical office, it is where the corporation's "nerve center" is.  *Hertz*, 559 U.S. at

13   92–93.  All available evidence indicates that nerve center is not at NAAVC's San Francisco office.

14   All of NAAVC's officers list Arizona addresses—two in Tucson, one in Phoenix—on filings with

15   the State of California.  NAAVC Statement of Information [Dkt. No. 20-7].  NAAVC's only

16   director is one of those officers.  *Id.*  Given this evidence, it is especially telling that NAAVC did

17   not allege that it is domiciled in this District.  Even if this San Francisco office were used

18   (NAAVC does not state what it is used for), it would need to be the place "where the corporation's

19   officers direct, control, and coordinate" NAAVC's activities.  Indeed, the Supreme Court has held

20   that a *headquarters* cannot qualify as a principal place of business, even if board meetings occur

21   there, if it is not the place this executive direction occurs.  *See Hertz*, 599 U.S. at 93.  At this stage,

22   what evidence there is indicates that NAAVC's nerve center is not in this District.

23   The plaintiffs also make a number of other, more attenuated arguments that venue is proper

24   here.  In the Reply on their first motion, the plaintiffs allege that NAAVC is incorporated in

25   California and "intends to begin its ministry" in California.  First PI Reply 9–10.  They also claim

26   that AYA "has a very large California congregation that it serves through the California

27   corporation" and Stanley, its founder (who is not a plaintiff), "spends enormous amounts time and

28   energy ministering to California residents."  *Id.* at 10.  They contend that both organizations "are

United States District Court
Northern District of California

1   deeply rooted in the State of California" and that a corporation's "state of incorporation is

2   fundamental to the corporate identity." *Id.*  They also argue that Stanley's "nominal address in

3   Arizona is no indication of where he may be on any given day, because that could be Peru,

4   California, Oregon, or any of another half-dozen states where AYA practitioners are joining

5   together in Free Exercise." *Id.*

6          In their Reply on their second motion, the plaintiffs argue that venue is proper in this

7   District because AYA "is a California corporation that serves the [839-member] California

8   congregation of AYA." Second PI Reply [Dkt. No. 53] at 7–8.  They claim that Stanley has

9   "performed 120 California ceremonies in the last five years" and "65 in Northern California." *Id.*

10  Further, "[t]he 'muscle center' of AYA in California is in all of the ceremonial locations where the

11  ceremonies have been conducted and in the homes of all the congregants who reside in

12  California." *Id.*

13         The plaintiffs also make more general allegations.  They claim that "[s]eizures of

14  Ayahuasca Sacrament arriving through the mails in California, as happened to NAAVC and AYA,

15  is increasing." First PI Reply 10.  They also contend that "California is a leader in the

16  decriminalization of visionary medicines" and Oakland, California "has been in the forefront of a

17  movement to mainstream the practice of visionary religion." *Id.*

18         Absent from even these allegations, however, is any indication that either entity's principal

19  place of business is in this District.  While an entity's state of incorporation can be relevant for

20  other pleading purposes, the venue statute does not determine residency based on it.  *See* 28

21  U.S.C. 1391(c)(2).  The closest the plaintiffs come to alleging a "nerve center" for AYA is that its

22  "muscle center" is "in all of the ceremonial locations where the ceremonies have been conducted,

23  and in the homes of all the congregants who reside in California." Second PI Reply 8.  For

24  purposes of federal venue rules, however, an entity's principal place of business "is a single

25  place." *Hertz*, 559 U.S. at 93.

26         Just as there is evidence that NAAVC's principal place of business is in Arizona, there is

27  similar evidence that AYA's is.  AYA's incorporation documents filed in Arizona and California

28  list addresses in Tucson, Arizona as the only addresses associated with AYA.  AYA Arizona

United States District Court
Northern District of California

1   Articles [Dkt. No. 20-2]; AYA California Articles [Dkt. No. 20-4].  Although the Arizona form

2   requires an Arizona address, the California form also indicates AYA's "business address" is in

3   Tucson.  In AYA's 2020 Annual Report to the Arizona Corporation Commission, it lists the same

4   Tucson address as on the California form for its "known place of business" and leaves blank the

5   "principal office address" line that follows.  AYA Annual Report [Dkt. No. 20-3].  Most

6   importantly, AYA lists two directors with Arizona addresses on its Arizona Articles of

7   Incorporation and only one director or officer, Stanley, whose address is in Arizona, on its

8   California filings.  Even if it is true that "Stanley's nominal address in Arizona is no indication of

9   where he may be on any given day, because that could be Peru, California, Oregon, or any of

10  another half-dozen states," First PI Mot. 10, it does not help the plaintiffs establish AYA's nerve

11  center as being in this District.

12          At the September 9 hearing, I asked plaintiffs' counsel if there were further arguments that

13  the principal place of business of AYA or NAAVC is in this District, but he largely repeated the

14  arguments in the briefs.  The plaintiffs have not pleaded or otherwise alleged that NAAVC and

15  AYA are domiciled in this District.  To the extent there is evidence one way or the other, it

16  uniformly indicates neither has its principal place of business here.

17                      **ii.     Villanueva's Residence**

18          Villanueva is, as far as can be determined, domiciled in Arizona, not this District.  *See*

19  FASC ¶¶ 199–200 (describing Villanueva's "residence" and "home" in Maricopa County);

20  Villanueva Decl. ¶ 17 (describing that residence as his "home").  The plaintiffs do not attempt to

21  argue otherwise.  Indeed, a fixture of the FASC is that the May 19 search was particularly harmful

22  because it was of Villanueva's home.  Instead of pleading and showing that Villanueva is

23  domiciled in this District, the plaintiffs argue that Villanueva "did not pick this venue" and that the

24  "defendants chose it for him when" they carried out the alleged operation to interfere with this

25  litigation.  First PI Mot. 10.  But the law is clear:  a plaintiff who is a natural person must be

26  domiciled in the district for venue to be proper.  Villanueva is not.

27          **d.   Conclusion**

28          The plaintiffs, in the future, may or may not be able to make a sufficient showing that

venue is proper in this District.  At present, they have not shown they can succeed on or create serious questions that go to the merits because venue is likely improper.  Both motions for preliminary injunctions are DENIED.

## V.    Federal Defendants' Motion to Enlarge Time to Respond

As an alternative to their motion to stay, the federal defendants request an enlargement of the time to respond to the FASC to 60 days after this order issues.  Stay Mot. 15–16.  The plaintiffs have indicated they would not oppose an extension to 30 days.  Dkt. No. 54 at 14.  I PARTIALLY GRANT the motion and extend the time the federal defendants have to file a responsive pleading to 30 days from the date the plaintiffs file an amended complaint or 60 days from the date of this Order if the plaintiffs do not amend their complaint.

## CONCLUSION

The Arizona and Maricopa defendants' motions to dismiss for lack of personal jurisdiction are GRANTED and they are dismissed from the case; the plaintiffs' motion for jurisdictional discovery is DENIED.  The federal defendants' motions to stay the proceedings and strike the FASC are DENIED.  The plaintiffs' motions for preliminary injunctions are DENIED.  If the plaintiffs wish to amend their complaint to address venue and the other issues discussed in this Order, they may do so within 30 days of the date of this Order. The federal defendants will have 30 days after that amendment to respond, or 60 days from the date of this Order if plaintiffs do not amend, to respond to the FASC.

**IT IS SO ORDERED.**

Dated: September 21, 2020

William H. Orrick
United States District Judge

---

[12] The plaintiffs' motion for relief from the filing rules is DENIED.  Thomas Prevoznik's motion to stay is DENIED AS MOOT.

United States District Court
Northern District of California